UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re SERVICEMASTER GLOBAL HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 2:20-cv-02553 (consolidated) |

<u>CLASS ACTION</u>

Judge S. Thomas Anderson

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    JURISDICTION AND VENUE ..............................................................5

III.   PARTIES .................................................................................................6

IV.    SUBSTANTIVE ALLEGATIONS ..........................................................7

     A.   Background to Defendants' Fraudulent Scheme and False and Misleading Statements and Omissions ...................................................7

          1.   Terminix Was Critical to ServiceMaster's Success....................................7

          2.   Leading Up to the Class Period, Defendants Assured the Market that Terminix's "[T]ransformation [E]fforts [A]re on [T]rack" .................8

     B.   During the Class Period, Defendants Misleadingly Assured Investors that ServiceMaster Was Executing Its Terminix Transformation and Monitoring the Level of Termite Damage Claims.................................12

     C.   Defendants' Fraudulent Scheme .........................................................14

          1.   Contrary to Its Contracts, Terminix Provided Inadequate Protection and Remediation for a Super Termite .......................................16

          2.   Terminix Furthers Its Wrongful Course of Business by Engaging in a Scheme to Conceal Mounting Formosan Claims...............................18

     D.   Defendants Knew or Were Reckless in Not Knowing of the Increased Claims and the Falsity of Their Class Period Statements .....................22

     E.   Defendants Were Forced to Reveal the Truth, Causing the Price of ServiceMaster Stock to Decline Dramatically ......................................23

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................25

     A.   Materially False and Misleading Statements and Omissions Regarding the Terminix Transformation...........................................................25

     B.   False and Misleading Statements and Omissions Regarding Termite Damage Claims...................................................................................31

     C.   Defendants' SEC Disclosure Violations...............................................36

**Page**

1.    The Material Adverse Trend in Termite Damage Claims as the Formosan Scheme Unraveled .....................................................................38

2.    The Impact of the Unsustainable Formosan Scheme on ServiceMaster's Future Results .........................................................38

VI.    LOSS CAUSATION AND ECONOMIC LOSS ...............................................40

VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE ................................44

VIII.    CLASS ACTION ALLEGATIONS .................................................................46

COUNT I ................................................................................................................48

COUNT II ...............................................................................................................49

IX.    PRAYER FOR RELIEF .................................................................................49

X.    JURY DEMAND ...........................................................................................50

4838-5795-0704.v1

Lead Plaintiff Teamsters Local 237 Welfare Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.   This is a securities fraud class action on behalf of all purchasers of ServiceMaster Global Holdings, Inc. ("ServiceMaster" or the "Company") common stock between February 26, 2019 and November 4, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2.   During the Class Period, ServiceMaster provided services to residential and commercial customers in the termite, pest control, cleaning and restoration markets. Terminix was ServiceMaster's largest and most profitable business segment, representing approximately 87% of the Company's revenues. In the years leading up to the Class Period, however, Terminix's growth had slowed. As such, in an attempt to revitalize its crown jewel, in 2017 ServiceMaster purported to transform the Terminix business, and thus increase growth, by telling investors it was focusing on customer service and operations. As part of its "transformation" efforts, the Company hired Defendant Nikhil M. Varty ("Varty") as Chief Executive Officer ("CEO") and appointed Anthony D. DiLucente ("DiLucente") as ServiceMaster's Chief Financial Officer ("CFO").

3.   Given the importance of Terminix's growth to ServiceMaster investors, throughout the Class Period Defendants assured investors that ServiceMaster was successfully executing its customer service-centric transformation, and that results in the segment had been and would

- 1 -

continue to drive revenue growth.  For example, on a conference call on February 26. 2019, the first day of the Class Period, Defendant Varty touted that ServiceMaster had made "tremendous progress" on its transformation, and rather than "[focus] on short-term cost cutting[, which] led to sharp declines in customer service levels and, ultimately, a declining growth rate," the Company was "creat[ing] a long-term sustainable business model that will convert consistent growth."  In addition, throughout the Class Period, Defendants publicly reported ServiceMaster Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") and assured investors that the Company was monitoring the level of termite damage claims.

4.     In truth, however, Terminix had been, and was continuing to be beset by costly termite damage claims, primarily related to Formosan termite activity in Mobile, Alabama, the vast scope of which Defendants concealed from investors.  Additionally, while Defendants told the market they were transforming Terminix by focusing on customers and customer service, in truth, Terminix was not honoring its warranty agreements, not adequately inspecting its customers' homes and businesses and not properly treating its customers' homes and businesses to prevent infestations.  As a result, the Company's risk and liability for termite damage claims was far greater than it represented to the market, which the Company understated, consequently, causing the Company's reported EBITDA to be inflated.

5.     Moreover, as damage claims increased from Defendants' actions, Defendants only furthered their wrongful course of conduct by implementing "mitigating" protocols in certain Formosan hot spots.  For example, beginning in 2018, Terminix modified its contracts to provide less coverage to its customers but at the same time drastically increased the price to renew the contracts by as much as 1000%.  An investigation by the Alabama Attorney General's Office and the Alabama Department of Agriculture and Industries ("ADAI"), concluded that Terminix's actions

were intended to covertly pass on litigation costs to its customers and to force customers to either "cancel their lifetime protection contracts or to accept new Terminix contracts that provided fewer benefits than consumers' existing lifetime contracts." As a result, and contrary to Defendants' assurances, the transformation was not taking steps to create a long-term business model designed to drive growth through a focus on customer service and customer retention, but instead was seeking to achieve unsustainable short-term gains at the expense of the Company's long-term success.

6.      The Individual Defendants were directly involved in the misconduct and scheme described herein. Indeed, Defendant DiLucente admitted that since Defendant Varty "joined us, we have been laser-focused on the Terminix transformation." Defendant Varty agreed, explaining that during his 20 months at the Company, he was "focused very heavily on transforming Terminix fundamentally." In addition, Defendant Varty participated in weekly and monthly meetings during which the topics of Formosan termite damage claims and the Company's mitigation efforts were discussed. Furthermore, Defendants oversaw the preparation and dissemination of ServiceMaster's fraudulent financial statements. While Defendants Varty and DiLucente repeatedly discussed the purported successes and impact of the transformation on Terminix throughout the Class Period with investors, they failed to disclose that: (a) the transformation was not being successfully executed in Formosan hot spots, such as Mobile, Alabama, where Defendants' scheme prioritized short-term cost-cutting over customer service that they told the market was driving, and would continue to drive, long-term growth; (b) as a result, ServiceMaster incurred and expected to incur tens of millions of dollars in additional costs related to Formosan termite damage and the payment of customer claims arising from such damage; (c) Defendants' scheme drove price increases; and (d) Defendants' scheme was designed to *reduce* customer retention in certain areas. Finally, while Defendants discussed the monitoring of damage claims throughout the Class Period, Defendants

- 3 -

failed to disclose the extent of the actual claims that had been made by customers due to the Formosan scheme and the risk of future claims related thereto.

7. Toward the end of 2019, however, Defendants could no longer cover up the increasing claims and devastating awards which had become routine in private arbitrations brought against Terminix, nor could Defendants continue to conceal the fraudulent business practices which increased the Company's exposure to liability for these claims. Accordingly, the true state of Terminix's business and financial condition began to be revealed.

8. On October 22, 2019, ServiceMaster announced poor preliminary financial results for the 3Q19. Blaming the poor results on losses stemming from Formosan termite activity in Mobile, Alabama that had been going on "over the last few years," ServiceMaster stated that during the quarter it had generated net income of only $25 million – a 65% year-over-year decline – and revised its projected full-year adjusted EBITDA range downward. In addition, the Company announced the sudden departure of the President of Terminix Residential, Matthew J. Stevenson ("Stevenson"), who was hired as part of Terminix's transformation efforts.

9. Weeks later, on November 5, 2019, ServiceMaster issued a release announcing its final 3Q19 financial results. In the release, the Company discussed its "'challenging quarter,'" stating that it had been impacted by certain "'legacy risks,'" including "'termite damage claims.'" In an earnings call later that day, Defendant Varty revealed that not only had the increase in termite litigation over "'the past few years'" impacted termite revenue by 7% to 8%, but also that increased claims would continue to impact the Company throughout 2020. Defendant DiLucente further disclosed that, in addition to "'$2 million in increased damage claims expense due to the increase in Formosan termite activity in the Mobile, Alabama area,'" the Company "'expect[ed] a year-over-

- 4 -

year increase from damage claims of approximately $4 million in the fourth quarter.'"  Shortly thereafter, Defendant Varty – the "face of the Terminix transformation" – abruptly resigned.

10.     As Defendants' misconduct reached the market, investors were shocked.  For example, an October 22, 2019 research report from *The Buckingham Research Group* stated: "***Termite claims are popping up seemingly out of the blue in Alabama***."  And ServiceMaster's stock plummeted, declining by nearly 40% from its Class Period high of $58.22 on August 22, 2019 to $35.74 on November 6, 2019.  The decline in the price of ServiceMaster common stock caused millions of dollars in losses to its investors, who suffered economic harm as the truth about ServiceMaster and its Terminix business began to be revealed.  This action seeks to recover these losses suffered by Lead Plaintiff and the Class.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b 5, promulgated thereunder by the SEC.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  During the Class Period, Defendant ServiceMaster was headquartered in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

- 5 -

## III.    PARTIES

15.    Teamsters Local 237 Welfare Fund was appointed Lead Plaintiff on May 13, 2021, 2021.  ECF No. 59.  As set forth in the certification attached to ECF No. 13, Lead Plaintiff purchased ServiceMaster common stock during the Class Period and was damaged thereby.

16.    Defendant ServiceMaster provided pest control, cleaning and restoration services to residential and commercial customers during the Class Period.   During the Class Period, ServiceMaster was headquartered in Memphis, Tennessee, and the Company's shares traded on the NYSE under the ticker symbol "SERV."  Following the filing of the Complaint for Violations of the Federal Securities Laws (ECF No. 1) in this matter, on October 5, 2020, ServiceMaster sold its ServiceMaster Brands franchise businesses, changed its name to Terminix Global Holdings, Inc. and began trading its stock under the NYSE ticker symbol "TMX."

17.    Defendant Nikhil M. Varty served as CEO of ServiceMaster during the Class Period. On January 21, 2020, ServiceMaster announced that, "effective immediately," Defendant Varty was leaving the Company.

18.    Defendant Anthony D. DiLucente served as CFO and Senior Vice President of ServiceMaster during the Class Period.  On December 7, 2020, Terminix Global Holdings, Inc. announced that Defendant DiLucente would retire.

19.    The Defendants referenced above in ¶¶17-18 are referred to herein as the "Individual Defendants."   The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of ServiceMaster securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ServiceMaster's quarterly reports, releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and releases alleged herein to be misleading prior to

- 6 -

or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pled herein.

20.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ServiceMaster common stock by engaging in the violative conduct alleged herein, which caused ServiceMaster securities to trade at artificially inflated prices during the Class Period.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background to Defendants' Fraudulent Scheme and False and Misleading Statements and Omissions

#### 1.     Terminix Was Critical to ServiceMaster's Success

21.     During the Class Period, ServiceMaster provided services to residential and commercial customers in the termite, pest control, cleaning and restoration markets through an extensive service network of more than 8,000 company-owned locations, franchises and license agreements.

22.     Terminix, ServiceMaster's largest and most profitable business segment, was a termite and pest control business that operated primarily in the United States.  Approximately 80% of Terminix's revenue was generated from the annual renewal of customer contracts.  Thus, the retention of Terminix customers was vital to ServiceMaster's financial health.

23.     As part of its efforts to attract and retain customers, Terminix offered an annual termite coverage plan for its customers.  To enter into such plans, Terminix offered a complimentary

- 7 -

initial inspection to assess whether the property had an existing termite infestation to determine customer eligibility. Then, upon entering into the contract, Terminix provided another inspection annually and further inspections on an as-needed basis. Should termites be discovered at any time, the coverage plan obligated Terminix to eliminate the infestation at no cost to the customer and cover the costs of further treatment as well as damages and repairs to the customer's property.

24.     The Terminix business was essential to ServiceMaster. Indeed, in 2017, Terminix represented more than 50% of ServiceMaster's total revenue. In October 2018, Terminix became even more critical to ServiceMaster's success as ServiceMaster spun off its American Home Shield business, which represented 40% of ServiceMaster's total revenue in FY17. As such, by the time the Class Period began on February 26, 2019, the Terminix business represented approximately ***87% of ServiceMaster's revenues and nearly 80% of EBITDA***.

25.     As Defendant Varty told investors shortly before the Class Period at ServiceMaster's December 11, 2018 Investor Day:

> ***[W]hat is ServiceMaster about?  What's the investment opportunity in [] our company?*** Why we are encouraged about the future? ***Pest control business or pest management is the core of who we are. And Terminix is the leading brand in this industry. Terminix also, by the way, delivers*** . . . .

26.     Given the fundamental and increasing importance of Terminix to ServiceMaster, information regarding Terminix provided critical insight for analysts' and investors' evaluations of the Company's financial condition and growth during the Class Period.

## 2.     Leading Up to the Class Period, Defendants Assured the Market that Terminix's "[T]ransformation [E]fforts [A]re on [T]rack"

27.     In the years immediately preceding to the Class Period, Terminix's growth had faltered. For example, organic revenue growth for Terminix slowed, and in FY17, adjusted

EBITDA in the Company's Terminix segment declined to $330 million, an 11% year-over-year decline.

28.    This ongoing decline posed a serious risk to the Terminix-dependent ServiceMaster. For example, a February 23, 2017, report from RBC Capital Markets identified "***Terminix growth [as] the primary issue***" for ServiceMaster in 2017.  Similarly, a July 17, 2018 J.P. Morgan analyst report explained, "***Terminix organic revenue growth remains the key variable for the S[erviceMaster] stock***[.]"  According to analysts, the root of Terminix's poor growth was customer service and customer retention.

29.    Recognizing that Terminix's growth had been slowing and that Terminix was essential to ServiceMaster's financial success, ServiceMaster assured its investors it would make a change.

30.    As Defendant DiLucente explained at the Analyst Day, for years Terminix focused on "short-term profitability," rather than "long-term sustainable organic growth through outstanding customer service."  Therefore, "in 2017, [ServiceMaster] realized it was time for a change.  And that change required a new dynamic leader, [so] Nik Varty joined the company . . . and a new strategy, which is the Terminix transformation . . . ."

31.    Defendant Varty explained to investors during ServiceMaster's 3Q17 webcast presentation on October 31, 2017, that the goal of the Terminix transformation was to "[d]eliver consistently strong revenue and earnings growth."  To accomplish this goal, ServiceMaster would focus on five activities: (1) "Build[ing] a Strong Leadership Team;" (2) "Driv[ing] accountability;" (3) "Empower[ing] our technicians to deliver an exception customer experience;" (4) "Develop[ing] a Strong Commercial Business;" and (5) "Implement[ing] [a] disciplined, Lean Six Sigma

Approach." During the presentation, Defendant Varty further elaborated on the five steps of the transformation:

> ***At Terminix, we are taking a disciplined approach to executing a series of systematic transformational activities to significantly upgrade the customer experience, improve our customer retention rates and profitably grow our market share.*** We are building a strong leadership team, with significant experience in delivering results and driving profitable growth . . . At the same time, we are creating a organizational structure that enhances personal accountability and supports a high-performance culture. We are empowering our route technicians to deliver an exceptional customer experience by giving them the tools they need to improve customer engagement while providing them with timely customer feedback. . . . We will develop a strong commercial business to better able to focus on and serve commercial customers . . .
>
> We will implement a disciplined, Lean Six Sigma approach to enhance efficiency, to significantly improve customer levels, strengthen our investment discipline and drive profitable growth. We are enhancing our ability to consistently deliver on our commitments by increasing our transparency, improving operational cadence and measurement systems and strengthening business processes with a goal of creating long-term sustainable value.

32.     In addition to hiring Defendant Varty as CEO, as part of its transformation ServiceMaster replaced several key senior management roles, appointing DiLucente as ServiceMaster's CFO, Pratip Dastidar ("Dastidar") as ServiceMaster's Senior Vice President and Chief Transformation Officer, and Stevenson as President of Terminix Residential.

33.     Given that approximately 80% of Terminix's revenue is generated from the annual renewal of customer contracts, Defendants told investors at its Analyst Day shortly before the Class Period that Terminix's transformation was dedicated to improving growth through a focus on customer service and operations, and that Terminix's "***transformation efforts are on track***" and "bearing fruit."

34.     For example, Defendant Varty highlighted that "in 2018, we were able to demonstrate that all the actions we were taking, all the transformation that we launched . . . is bearing fruit." He also stated that the transformation efforts would "create the sustainable organic growth that we

- 10 -

need."   Echoing Defendant Varty, Defendant DiLucente represented that "the Terminix transformation . . . will help drive sustainable organic growth."

35.     Moreover, Defendant Varty and Defendant DiLucente highlighted the transformation's impact on Terminix Residential, particularly on the critical issue of customer retention.  For example, Defendant Varty advised:

> with the transformation efforts on track, you can see when a team, an incredible team puts its attention on something like [R]esidential pest, we were able to show some handsome growth in the right direction, and this is with all the leading indicator[s] starting to point in the right direction.

36.     Similarly, Defendant DiLucente explained that the transformation efforts in the Residential segment were centered on:

> better customer engagement. . . .  And you can see the area, ***where we were actually showing declining growth has now turned positive.  And in particular in the third quarter of 2018, we delivered 7.8% growth in the residential pest control segment.***
>
> *       *       *
>
> ***The real opportunity, as Matt [Stevenson] talked about, is retention***.

37.     Moreover, Defendant DiLucente reassured investors that Terminix would continue its "laser focus" on customer retention in 2019, which would "fuel us and propel us further."

38.     Unsurprisingly, nearly every analyst reporting on ServiceMaster's Analyst Day highlighted the Company's assurances that the transformation was "on track" and that Terminix was the key driver of revenue growth for 2019:

- ***"Investor Day takeaways: helpful color on transformation initiatives and path to industry growth rates – ALERT*** . . . Yesterday we attended ServiceMaster's Investor Day in NYC.  The helpful presentations reviewed growth drivers and market opportunities for the company's Terminix and ServiceMaster Brands ("SB"; fka Franchise Services Group) segments, ***including a particular focus on the company's transformation within Terminix***."  J.P. Morgan Chase & Co. (Dec. 10, 2018).

- "Transformation Continues. . . .  We recently attended SERV's Investor Day in New York, where management focused on the ongoing transformation occurring at

SERV. . . .   *SERV's primary focus remains accelerating Terminix growth*." Morgan Stanley (Dec. 12, 2018).

**B.     During the Class Period, Defendants Misleadingly Assured Investors that ServiceMaster Was Executing Its Terminix Transformation and Monitoring the Level of Termite Damage Claims**

39.     Because Terminix was critical to ServiceMaster's financial growth, Defendants worked during the Class Period to convince ServiceMaster investors that Terminix was turning around through customer service initiatives and was driving growth and profit in 2018 and 2019.

40.     Indeed, Defendants' assertions at its Analyst Day that it was successfully executing the Terminix transformation were bolstered a few months later when the Company announced its FY18 financial results.  In a release on the first day of the Class Period, February 26, 2019, Defendant Varty told investors that Terminix's transformation "efforts" resulted in "record revenue" and "unlock[ed] the potential to drive sustainable revenue growth."

41.     Moreover, during an earnings call later that day, Defendants continued to highlight Terminix's success in executing its transformation plan.  For example, Defendant Varty stated:

> We made ***tremendous progress on the core business in 2018*** . . . .  Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high. . . .  We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer service levels and, ultimately, a declining growth rate.  ***We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth, both organically and through acquisitions, to the bottom line. . . .  [W]e can deliver on our future commitments just as we have done in 2018***, and I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value.

42.     Analysts reported on these developments positively.  For example, in a February 26, 2019 report, J.P. Morgan raised its price target following the statements, stating:

> ***4Q18 provided further evidence that mgmt is prudently rebuilding the fundamentals of the company's flagship pest control business*** . . . and suggests 2-3% is just a stepping stone to faster growth. . . .  ***Terminix growth shines***.

- 12 -

A February 26, 2019, report from William Blair stated: "[W]e are **beginning to see some benefit from management's new strategic direction. We expect recent investments in new systems and processes to drive further improvements in retention as Terminix moves through fiscal 2019**."

43.     As a result of Defendants' positive statements, ServiceMaster's common stock price closed up $6.40, or 16% on February 26, 2019 on extremely high trading volume.

44.     Moreover, throughout the Class Period, Defendants assured investors that they were monitoring the level of termite damage claims. For example, Defendants' annual and quarterly SEC filings, signed by Defendants Varty and DiLucente, provided information regarding ServiceMaster's accounting for termite damage claim accruals. *See infra* at ¶¶96-97, 99, 103. The "Significant Accounting Policies," section of ServiceMaster's FY18 Form 10-K discussing "accruals for termite damages claims" stated that there were "no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates," with respect to termite damage claims.

45.     During the Class Period, Defendants also stated that pricing changes were due to favorable market conditions and margins that would continue to improve in the second half of 2019. *See infra* at ¶86. For example, in response to an analyst's question regarding increased pricing on a May 7, 2019 earnings call, Defendant DiLucente stated:

> I think the latter explanation you gave [of the "market" being "supportive of better pricing"] is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – would be bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily. So [a] pretty typical thing for us.

46.     Analysts reported that they were encouraged by Defendants' statements. For example, a May 7, 2019, report from J.P. Morgan stated:

> ***In our view, the Terminix turnaround feels as solid as ever***, with 1Q19 providing further evidence that m[anagement] is prudently rebuilding the fundamentals of the

- 13 -

company's flagship pest control business – both in residential and commercial markets – and we see mid-single digit organic revenue growth coupled by expanding margins on the horizon.

- ***Continued progress in the turnaround***.  In 1Q19, the flagship ***Residential Pest Control*** segment grew +4.3% organically, driven by strength in price realization . . . .

Again, ServiceMaster's common stock price reacted positively, closing up $4.44, or 9%, on May 7, 2019.

### C.    Defendants' Fraudulent Scheme

47.    Throughout the Class Period, Defendants were engaged in a fraudulent scheme that was hindering Terminix's transformation, and the Company's overall growth, as well as increasing the Company's risk and liability for customer termite warranty claims.

48.    Defendants' scheme included: (a) providing inadequate termite protection and remediation to its customers in Formosan hot spots, such as Mobile, Alabama; and (b) covering up the scope and impact of Formosan damage claims by: (i) refusing and/or delaying the payment of claims and damage awards, in whole or in part, absent a legitimate basis; and (ii) implementing "mitigating" protocols in certain Formosan hot spots, like Mobile, Alabama, which involved modifying renewal contracts with customers to provide fewer services at the same time as increasing the cost to renew as much as 1000% in an effort to drive away customers before they could discover their property was infested by termites.  By concealing this scheme, Defendants misled investors about the true state of Terminix's business, ServiceMaster's progress on the "transformation" and the true nature of Terminix's growth.  Additionally, by concealing the actual claims that had been made by customers due to the Formosan scheme, and the risk of future claims related thereto, ServiceMaster materially understated the accrual associated with this liability, thereby overstating the Company's reported EBITDA.

4838-5795-0704.v1

49.     Several decades ago, the Formosan species of termite, commonly referred to as the "super termite," was first introduced to the United States.  Since then, the Formosan termite has been considered the most aggressive and economically devastating species of termite in the United States, causing approximately $1 billion a year in property damage.  Like other subterranean termites, the Formosan termite feeds on materials that contain cellulose, but because of its larger colony size, the Formosan termite attacks a greater variety of wood at a faster rate than subterranean termites native to the United States.  Worse still, the Formosan termite has an enormous reproductive capacity, with a typical colony easily exceeding one million insects.

50.     In the United States, the Formosan termite exists in warm, humid climates, and is most commonly found in Gulf Coast states, such as Alabama, Florida, Georgia, Louisiana, Mississippi and Texas.  The Formosan termite has also been found in North Carolina, South Carolina, Hawaii and California.

51.     Similar to all subterranean termites, the Formosan termite constructs shelter tubes out of mud to travel from its underground nest to a food source.  The Formosan termite also uniquely constructs above-ground nests within the structures it infests.  In the context of a structural infestation, these nests are typically found within walls and are referred to as "cartons" in the pest control industry.  The possibility of both a Formosan nest close to a structure and an above-ground nest within the structure can greatly increase the damage potential of these termites.  Accordingly, it is imperative to closely monitor and promptly treat any sign of Formosan termite activity.  Property owners in at-risk areas therefore rely heavily on Terminix's annual protection contracts to safeguard against catastrophic damage from a Formosan termite invasion.

1.   **Contrary to Its Contracts, Terminix Provided Inadequate Protection and Remediation for a Super Termite**

52.     From the outset of the transformation and throughout the Class Period, Formosan termites were the greatest problem facing Terminix.  Worse still, and unbeknownst to investors, the substantial Formosan termite infestation was exacerbated by Terminix's systematic failure to adequately treat homes and businesses in at-risk areas for these super termites.  In fact, not only did Terminix routinely fail to perform initial inspections or provide adequate Formosan termite treatment for its customers in hot spots, it also failed to conduct proper required follow-up inspections or retreatments.

53.     For example, CW1[1] stated that Terminix's representatives were not incentivized to do proper initial inspections and thus did a poor job of inspecting of its customers' homes and businesses.  Further, CW4, a Mobile, Alabama branch manager from 2009 to 2018, stated that a random sample of customer contracts in CW4's branch revealed that 40% of properties had not been treated properly or at all in the years leading up to the Class Period.  Attorneys for claimants in a private arbitration reported after the Class Period that Terminix did not properly treat homes 96% of the time.  Further, CW4 confirmed that Terminix consistently undertreated properties in Mobile, Alabama.  For example, if a property should have been treated with 600 gallons of pesticide, Terminix cut costs and may have only used 100 gallons.

54.     Recent arbitration testimony of Alabama branch managers and a regional manager revealed that, prior to the Class Period, the branches conducted studies of the claims rate in these areas and discovered that incomplete and worn-off treatments were causing huge amounts of damage.  Accordingly, the managers, Steve Barnett, Tom Hodges and Terry Henson, recommended

---

[1]   CW1 worked at Terminix between 2017 and 2019 analyzing sales trends and setting pricing in order to maximize Terminix's profitability.  CW1's work involved analyzing customer claims for Formosan termite damage.

procedures to provide adequate treatment.  Terminix's executives, however, refused to implement these changes and instead fired the managers.

55.     Substantiating these claims, an "investigation by the Alabama Attorney General's office and [ADAI]," released after the Class Period, confirmed "that Terminix . . . failed to deliver or provide the termite protection services" promised to its Alabama customers, and "[a]s a result, many homes and businesses suffered [Formosan] termite infestation."[2]

56.     In the years leading up to the Class Period, Terminix was beset by costly termite litigation, primarily related to Formosan termite activity in Mobile, Alabama.  According to CW1, the litigation claims were so overwhelming in Alabama that Terminix's outside counsel had to work out a scheduling agreement limiting counsel to trying 26 cases a year so that it would have at least one week for preparation between trials.  As a result of this limitation, by 2017, *years* of nonstop litigation was scheduled just so Terminix could resolve its backlog of currently pending termite claims.  The scale of these litigation claims was concealed from investors.  Indeed, ServiceMaster ensured that its Terminix contracts included a clause requiring non-public arbitration of any disputes through the American Arbitration Association.

---

[2]     *See* Steve Marshall, Alabama Attorney General, *Attorney General Steve Marshall Announces $60 Million Settlement with Terminix Over Illegal Business Practices Targeting Alabama Consumers* (Nov. 5, 2020), available at https://www.alabamaag.gov/NewsViewer/69822281-8337-40ec-8761-d603f91f10a6.  Notably, on November 5, 2020, "[a]fter being confronted with the evidence of its illegal acts," Terminix agreed to a $60 million settlement.  Specifically, Terminix agreed, among other things to: (1) set aside $25 million for customers that were subjected to these unconscionable price increases on renewed contracts *prior to and during the Class Period*; (2) set aside $10 million to retreat 12,000 of its customers' homes in Mobile and two other at-risk Alabama counties; and (3) provide "[n]ew, competent, and complete inspections of homes in the areas affected by Formosan termites."  *Id.*; *see also Attorney General: $60 million settlement reached after Terminix's alleged illegal business practices targeting Alabama consumers*, WKRG-TV (Nov. 5, 2020), available at https://www.wkrg.com/alabama-news/attorney-general-60-million-settlement-reached-after-terminixs-alleged-illegal-business-practices-targeting-alabama-consumers/.

### 2. Terminix Furthers Its Wrongful Course of Business by Engaging in a Scheme to Conceal Mounting Formosan Claims

57.     Because ServiceMaster executives understood that a turnaround of its core Terminix business was essential, beginning in early 2018 Defendants furthered their scheme to conceal the increasing termite litigation claims and damage to the Company's financial results from such claims.

58.     Accordingly, in April 2018, Defendants created a new Terminix region that included the eight branches most affected by the Formosan termites, including the Mobile, Alabama branch. This new region implemented special mitigating procedures aimed at dealing with the Formosan problem.

59.     For example, beginning in 2018, Defendants suddenly raised the prices on Terminix's contract renewals.  Jeff Curtis, Terminix's former Director of Operations for the Gulf Region and current National Director of Claims, testified in a June 19, 2020 deposition in connection with an arbitration that beginning in 2018 Terminix raised renewal premiums from approximately $100-$300 to $1,500 a year – more than an 1000% increase.[3]  The contracts accompanying these price increases provided Terminix's customers with fewer benefits than their original contracts.  For example, the new contracts eliminated repair guarantees for the first ten months of the contract and narrowed the value of any claims.

---

[3]     Prior to and during the Class Period, Stevenson, who reported directly to Defendant Varty, was directly and intimately involved in the claims process and setting the new price changes.  For example, CW2, who worked at ServiceMaster and Terminix between 2005 and 2019 in various positions relating to customer marketing and retention and attended Steering Committee or "STEERCO" meetings where Terminix's problems with the Formosan termite were routinely discussed, reported that Stevenson reviewed and signed off on all the marketing materials associated with the price changes.  Further, during the Class Period, CW3, a former Terminix Brand sales manager working in Mobile, Alabama, reported that Stevenson had to approve every claim over $50,000.  As CW3 explained, nearly 100% of the claims for $50,000 or more were coming out of Mobile, Alabama.

- 18 -

60.     Contrary to Defendants' assurances that the Terminix transformation was improving growth and creating long term sustainable value by improving customer retention rates, according to CW1 and CW2, Defendants utilized these price increases in an effort to run its own customers off before the customers uncovered any Formosan damage and to cover the increasing litigation costs the Company was incurring.  Indeed, contrary to their public statements, CW1 stated that Terminix anticipated that their price gauging would lead more than 90% of at-risk customers to cancel their lifetime guarantee contracts.[4]

61.     Corroborating these reports, the Alabama Attorney General and ADAI investigation uncovered evidence revealing:

> When customers suffered damages as a result of Terminix's failure to provide paid-for services, the company simply passed on these costs to Alabama consumers, in some cases charging them exorbitantly high annual renewal rate increases of up to 1000 percent.  Terminix's actions were intended to force consumers to cancel their lifetime protection contracts or to accept new Terminix contracts that provided less benefits than consumers' existing lifetime contracts.

*Attorney General Steve Marshall Announces $60 Million Settlement with Terminix Over Illegal Business Practices Targeting Alabama Consumers*.  Consequently, the Attorney General found that in attempting to mitigate the Formosan litigation costs known internally at the Company, "Terminix violated several provisions of the Alabama Deceptive Trade Practices Act, an Alabama law designed to protect consumers from deceptive, fraudulent, unconscionable, and illegal acts . . . ."  *Id.*

62.     Defendants' mitigating efforts, however, failed.  Customers living in Formosan hot spots could not afford to lose their termite protection as many insurance companies required

---

[4]    Furthermore, as part of the scheme, Terminix also began changing, *inter alia*, the claims process and treatments.  An attorney for the claimants stated in July 2020 that Terminix's treatment change was performed in Mobile "in the hope that they will stop termite damage before its victims discover the hidden damage that is already occurring inside walls, ceilings and floors.  [So that] [i]f these customers later discover the damage, Terminix will try to use a limitation in its contract that says customers have to find living termites in the property for Terminix to be liable."

homeowners to have termite protection in these at-risk areas.  Thus, despite the substantial price increases, many Terminix customers renewed their plans and sought to requalify and be retreated. As such, Defendants' risk of liability to termite damage claims actually increased as the Attorney General of Alabama began an investigation into Terminix's dramatic price changes.

63.     In addition to instituting the above protocols to conceal the increasing claims and risk of future claims, Defendants routinely refused to pay, or sought to delay, damage claims and/or awards absent any legitimate basis, including by appealing any award over $1 million to delay payments, regardless of the merits of the appeals.

64.     For instance, Defendants' Director of Termite Damages Claims testified in an arbitration hearing that upon advising a senior Company executive that an Alabama home, which had never been adequately treated, must be demolished and replaced due to Formosan damage, the senior executive refused to pay the $250,000 rebuild cost.  This refusal was in direct contravention to Terminix's contracts.  Instead, senior Company executives simply offered the homeowners $72,000, conditioned on their silence about receiving the payment and agreement not to disparage Terminix.

65.     Terminix's actions backfired, however, when the claimants took the Company to arbitration and were awarded more than $2.5 million, which included punitive damages.  During the Class Period, the arbitrator – like many subsequent arbitrators – found: (1) "Terminix knew it had not performed the initial inspection or treatment" of a customer's home; (2) Terminix "knew that annual inspections of the entire structure were not done;" (3) Terminix "knew that the location of the house was in a precarious area because of Formosan activity"; and that (4) "[w]hen fraud is the chosen direction of a company's 'service' to its trusting customers and it tries to limit its responsibility for the damage it causes, it is reprehensible." *McLaurin v. Terminix*, Arbitrator's Decision, at 10.

66.     Far from being an isolated decision, from 2018 to 2020, Terminix was routinely ordered to pay millions of dollars to its customers after being found liable in recurring private arbitrations, including, but not limited to:

- A $1.6 million award for failing to adequately protect an Alabama customer's home from Formosan termites in the decades leading up to the Class Period. *Weatherby v. The Terminix International Co., L.P., et al.*, Arbitration Order.

- An approximately $2.1 million award to a Mobile homeowner for failing to provide: (1) an adequate initial treatment; (2) adequate ongoing treatment; and (3) adequate inspections or remedial measures for termite damage. *Peebles v. The Terminix Int'l Co. L.P., et al.*, Arbitrator's Final Award.

- An approximately $3.8 million award to an Alabama homeowner because the evidence revealed a "***systematic and repeated pattern***" by Terminix of failing to satisfy its contractual obligations with regard to termite protection. *Britt v. The Terminix Int'l Co., L.P., et al.*, Award of Arbitrator.[5]

67.     Defendants did not disclose the devastating and consistent findings from these arbitration proceedings and, because the proceedings were private, were able to conceal the extent of their liabilities from investors.  In doing so, Defendants hid Terminix's "systematic and repeated pattern . . . of failing to comply with its contractual and regulatory duties," misleading investors about: (1) the true state of ServiceMaster's critical Terminix segment; (2) the "transformation" efforts and successes they touted were "bearing fruit"; (3) the Company's exposure in costly litigation resulting in determinations requiring it to honor its agreements to remediate customer properties impacted by the Formosan termite; and (4) the hefty damage awards to those customers for failing to do so.

---

[5]     Following the award, the parties entered into a private settlement.  *Britt v. The Terminix Int'l Co., L.P., et al.*, No. 20-0383-MU, ECF No. 37 (S.D. Ala. Dec. 8, 2020).

**D.     Defendants Knew or Were Reckless in Not Knowing of the Increased Claims and the Falsity of Their Class Period Statements**

68.     Defendants Varty and DiLucente repeatedly highlighted the importance of Terminix's transformation to ServiceMaster's success.   Indeed, Defendant Varty stated during the December 2018 Investor Day that the transformation was the driving force of the "sustainable organic growth that we need."

69.     Defendants were also vitally focused on the Formosan issue that was hindering the awaited turnaround of its core business.  For example, CW1 confirmed that immediately prior to the Class Period, Defendant Varty participated in weekly STEERCO meetings, during which the topics of Formosan termite damage claims and the Company's mitigation efforts were routinely discussed. These all-day meetings were also attended by Stevenson; Mathew Loos, Vice President, Marketing and Sales Effectiveness at Terminix; and Mac McCallister, Terminix's General Counsel, all of whom reported directly to Varty.  CW2, who attended STEERCO meetings, also confirmed that the Formosan termite issues were routinely discussed at these in-depth meetings prior to and during the Class Period.   Finally, CW1 confirmed that leading up to the Class Period, Defendant Varty discussed the Formosan termite issues in Mobile, Alabama during his "leadership team" meetings.

70.     Defendants admitted they were singularly focused on Terminix's transformation efforts during the Class Period.   Indeed, on the very first day of the Class Period, Defendant DiLucente stated: "Since Nik joined us, we have been laser-focused on the Terminix transformation."  Defendant Varty also advised the market a few months later: "I've been with the company now about 20 months, and what we've done since then is we focused very heavily on transforming Terminix fundamentally."

71.     Moreover, Defendant Varty – "the face of the Terminix transformation" – abruptly resigned as ServiceMaster's CEO a mere two months after the fraud was revealed.  Notably, analysts

- 22 -

and the media were quick to connect the dots between the alleged fraud and Defendant Varty's departure. For example, on the day of Defendant Varty's resignation, a RBC Capital Markets report stated: "***CEO exit is not good optics, in our view, given the outstanding legacy termite claims issue for the Terminix business*** that has been an overhang on the stock, which is down 34.5% since the company pre-announced 3Q results Oct 22 (S&P +10.7%) and disclosed higher-than-expected cost pressure . . . ."

72.     Stevenson, another face of the Terminix transformation who reported directly to Defendant Varty during the Class Period, abruptly resigned as well when the alleged fraud began leaking out to the market. As one attorney with extensive experience litigating Formosan claims against Terminix observed: "***[T]he rats may be jumping ship . . . . In the last 13 weeks, as its stock price sunk like the doomed ocean liner, Matt Stevenson, the President of Terminix Residential, and Nik Varty, the CEO of ServiceMaster, have both either abandoned ship or were asked to walk the plank***."

73.     Accordingly, Defendants were aware or reckless in not knowing that their positive statements during the Class Period regarding the purported success of ServiceMaster's Terminix transformation, and operational and financial results and trends as a result of the "transformation" efforts, were misleading and/or lacked a reasonable basis. Furthermore, Defendants were aware or reckless in not knowing that their reported EBITDA was inflated as they materially understated the accrual associated with the actual claims that had been made by customers due to the Formosan scheme, and the risk of future claims related to it.

> **E.     Defendants Were Forced to Reveal the Truth, Causing the Price of ServiceMaster Stock to Decline Dramatically**

74.     Beginning on October 22, 2019, the truth regarding the scope of the adverse impacts of the Formosan termite activity began to leak out to the market with the Company admitting that

- 23 -

"termite damage claims arising primarily from Formosan termite activity" had "been increasing over the last few years."  On November 5, 2019, Defendants expanded on these undisclosed adverse impacts, announcing that the quarter had been impacted by "legacy risks," including "termite damage claims."

75.     Defendants' admissions on October 22, 2019 and November 5, 2019 further revealed what Defendants had been misrepresenting and concealing during the Class Period.  For example, ServiceMaster admitted that the "damage claims arising primarily from Formosan termite activity" had grown so severe that since 2018 the Company had undertaken operational changes to "manage the impact of termite damage claims."  Defendant Varty later acknowledged that one of these mitigating procedures was a pricing initiative to drive its customers away and thereby reduce the Company's exposure to these costly claims.  Defendant Varty further acknowledged that not only had the increase in termite litigation already impacted Terminix revenue by 7% to 8% but also that the increase in claims would continue to impact the Company throughout 2020.

76.     Analysts were shocked by this admission.  For example, an October 22, 2019 report from *The Buckingham Research Group* stated:

> ***Termite claims are popping up seemingly out of the blue in Alabama*** . . . . We saw some lawsuits filed but we saw no evidence of any trouble in SERV's numbers until the preannouncement earlier this week. . . . ***Terminix is nowhere near as far along in its transformation progress as we thought***.

On October 22, 2019, *Morgan Stanley Research* also reported that the new damage claims costs "were not anticipated" by investors.

77.     In response to these revelations, ServiceMaster's share price fell precipitously, losing $20.44 per share between October 21 and November 6, 2019, at 36% drop.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

78.   During the Class Period, Defendants made false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, including statements regarding the Terminix transformation, EBITDA, termite damage claims and the risks associated therewith.

### A.   Materially False and Misleading Statements and Omissions Regarding the Terminix Transformation

79.   Throughout the Class Period, Defendants repeatedly chose to speak to investors about the successful execution of the transformation plan.  Indeed, Defendants repeatedly emphasized that their successful transformation efforts were fundamental to ServiceMaster's revenue growth and that their real focus on improving customer service had been and would continue to drive revenue growth.  As detailed herein, in truth, Terminix provided its customers with inadequate termite protection and undertook short-term solutions to cover up increasing damages and liability to customers to remediate termite infestations, such as driving its customers to cancel their contracts, all while concealing from investors the risks posed by such practices.

80.   On February 26, 2019, ServiceMaster reported its financial results for 4Q18.  In its release, ServiceMaster provided full-year 2019 revenue guidance of $2.02 to $2.05 billion, or an increase of 6% to 8% compared to 2018 and projected organic revenue growth at Terminix in the range of 2%-3%.  Defendant Varty was quoted in the release, touting the Company's successful execution of its transformation plan, stating in part:

> "Our primary goal in 2018 was to transform our Terminix business and unlock the potential to drive sustainable revenue growth.  We are pleased to report that our focused efforts throughout 2018 and strategic initiatives resulted in record revenue at Terminix in the fourth quarter and full year 2018," said ServiceMaster Chief Executive Officer Nik Varty.  "Improvements in pest sales, driven by enhanced marketing initiatives, and stronger start and completion rates drove organic growth of

- 25 -

5 percent during the quarter, including over 7 percent in residential pest for a second consecutive quarter."

81.     Later that day, Defendants held a conference call with investors.  During the call, Defendant Varty emphasized that the Terminix transformation plan was being executed successfully, creating a "long-term sustainable business model."  He stated in part:

> We made tremendous progress on the core business in 2018, while taking on an increased workload to deliver on the spin, which was a major commitment to our shareholders.  Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high.  With 5% organic growth in the quarter, we are approaching industry-level growth rates and have direct line of sight to 30% incremental margins.  We are focused on improving profitability in the Terminix business, but we are approaching the next steps in a strategic, disciplined manner.  We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer service levels and, ultimately, a declining growth rate.  We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth, both organically and through acquisitions, to the bottom line.  By focusing on our mission of creating cleaner, healthier, safer environments for our customers at home, work and play, we can deliver on our future commitments just as we have done in 2018, and I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value.

82.     As a result of Defendants' positive statements, ServiceMaster's common stock price closed up $6.40, or 16%, on February 26, 2019, on extremely high trading volume.

83.     On March 1, 2019, ServiceMaster filed its annual report on Form 10-K with the SEC, which was signed and certified by Defendants Varty and DiLucente.  The Form 10-K highlighted the importance of Terminix customer renewals and explained that the Company's long-term termite service plan was key to its competitive advantage, stating in pertinent part:

> Approximately 80 percent of Terminix revenue comes from customers who enter into contracts with the option to renew annually.  Typically, termite services require an initial inspection and the installation of a protective liquid barrier or bait stations surrounding the home.  The protection plan contracts provide a guarantee for the repair of new damage resulting from termite infestation.  After the first year, a customer has the option to renew the contract at a significantly reduced cost that extends the guarantee.  Consequently, revenue generated from a renewal customer is less then [sic] revenue generated from a first-year termite customer.

- 26 -

We believe that the strength of the Terminix brand, along with our history of providing a high level of consistent service, allows us to enjoy a competitive advantage in attracting, retaining and growing our customer base. We believe our investments in systems and processes, such as routing and scheduling optimization, robust reporting capabilities and mobile customer management solutions, enable us to deliver a higher level of customer service when compared to smaller regional and local competitors.

Our focus on attracting and retaining customers begins with our associates in the field, who interact with our customers every day. Our associates bring a strong level of passion and commitment to the Terminix brand, as evidenced by the 9-year and 8-year average tenure of our branch managers and technicians, respectively. Our field organization is supported by dedicated customer service and customer care center personnel. Our culture of continuous improvement drives an intense focus on the quality of the services delivered, which we believe produces high levels of customer satisfaction and, ultimately, customer retention and referrals.

84. On May 7, 2019, ServiceMaster issued a release announcing its financial results for 1Q19 and affirming its full-year 2019 guidance. Defendant Varty was quoted in the release, specifically referring to "positive trends" in Terminix driven by customer retention and "continued improvement in customer service," and stating in part:

"Our solid performance in the quarter reflects the consistent progress we are making on executing our strategic initiatives," said ServiceMaster Chief Executive Officer Nik Varty. "In our pest control core, organic growth of 3 percent in the quarter included 4 percent growth in residential pest and 2 percent in termite and home services, despite the impact of unseasonably cold weather and flooding on our operations and lead flow. We see positive trends in commercial pest with customer retention reaching three-year highs, driven by continued improvement in customer service as we leverage the best practices of Copesan and enhance the customer experience we deliver. ServiceMaster Brands grew revenue organically 5 percent in the first quarter. Our focus on high-growth market verticals is paying dividends with healthcare cleaning and disinfection up 7 percent and commercial restoration up 35 percent in the quarter. Strategic M&A also continues to be a growth driver, with 11 pest control acquisitions in the quarter."

85. That same day, the Company held a conference call with investors and analysts to discuss the Company's financial results. During the call, Defendant Varty again stated that the Company was successfully executing upon its enhanced customer service initiatives, which were key to ServiceMaster's transformation plan, stating in part:

- 27 -

Underlying all of these initiatives is reimagining the customer experience. Excellent customer service, easy to talk about but incredibly difficult to consistently deliver.  My job as a leader of ServiceMaster is to empower our customer-facing employees with the training, tools and motivation needed to deliver consistently excellent customer service at every touch point.  We are creating a culture obsessed with service delivery.  And while that mindset will take time to permeate throughout our organization, we are already making great strides.

86.     During the question and answer portion of call, Defendants were questioned as to what was driving Terminix's higher pricing, which Defendant DiLucente claimed was due to favorable market conditions as reflected in the following exchange:

[Analyst:] Tony in your prepared remarks, I heard you mention termite pricing a couple of times being better.  That's consistent with some of the survey work that we've done recently on the pest control market.  Can you just talk about what's driving the better pricing?  Is that just Terminix kind of going out and getting what it feels it deserves, where it's been lacking?  Or do you feel just like the market is supportive of better pricing?  Could you just sort of frame what's driving the better pricing?  Because that's something that we're definitely seeing in our survey work.

[DiLucente:] Sure.  Thanks, Seth.  And I think the latter explanation you gave is really the best answer.  The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well.  So if you think about – we bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily.  So [a] pretty typical thing for us.

87.     Also during the call, Defendant Varty was questioned as to whether he was seeing any "new business trends" in "termite control," and if so, "how [they] [were] performing."  In response, Defendant Varty stated that ServiceMaster's "renewed efforts" were "starting to pay dividends," which was a "positive sign for [the Company's] termite business," stating in part:

I mean what we're seeing right now is based on our new – renewed efforts to focus heavier on preventive rather than just curative is starting to pay dividends.  It's just an initial rollout of our bundled offerings.  So this will take some time to take traction, but already our customers are appreciating in our pilot programs sort of what's happening.  I'm also even more excited for the future where we're driving these clean sheet designs, and termite was the first program we picked up on where we're completely redefining, how we do business with our customers and completely reimagining the journey and touchpoints that we have.  So I see a lot of good – and all of this new stuff that we're going to drive is only going to work if our service levels start creeping up.  And seeing the NPS score month after month after month

- 28 -

improving and also finally starting to see the cancellations turnaround is a very positive sign for our termite business.

88.    Again, ServiceMaster's common stock price reacted positively, closing up $4.44, or 9%, on May 7, 2019.

89.    On August 6, 2019, ServiceMaster issued a release reporting its financial results for 2Q19.  In the release, Defendant Varty touted the improvements in customer retention at Terminix, stating in part:

> "Our relentless efforts on improving customer service and focus on employee performance capabilities enabled us to deliver strong organic revenue growth at Terminix, including the best organic growth we have seen in more than three years in our commercial pest service line.  Improvements in customer retention and price realization drove growth across revenue channels, which more than offset the impact of unseasonable weather conditions."

90.    That same day, ServiceMaster held a conference call with investors and analysts to discuss its 2Q19 financial results.   On the call, Defendant Varty stated that the Terminix transformation plan was being executed successfully with a focus on customer service, stating in part:

> Our focus on customer service is continuing to strengthen our core, and Slide 6 provides an example of progress we are making across our businesses.  Residential.   Starting in Terminix Residential, our focus on the fundamentals is resulting in a measurable, better customer experience built on significant improvements in the basic blocking and tackling of our route-based business.  For example, missed appointments were down over 50% in the quarter versus [the] prior year.  We are also making progress against our goal of speaking with customers before and after every service visit, allowing us to clearly explain the value of our services and set expectations for upcoming visits.  We are also making meaningful improvement in the most important aspect of our business, our safety culture, with preventable accidents and injuries down 15% in the quarter.  Returning our teammates home safely is our top priority every day.  We have been able to make these strides while also improving labor productivity by $2 million year-over-year to enhance overtime management and a targeted initiative to move many hourly technicians to a production-based pay plan.
>
> These initiatives helped drive a 4% reduction in Q2 year-over-year cancel rates in termite and residential pest control.  We're also encouraged to see external confirmation of improving customer satisfaction through positive independent survey

- 29 -

results over the last few months, one of which recently reported 91% customer satisfaction rate for Terminix, highest in the industry. While that kind of feedback is gratifying, we're not letting up. We know there is still considerable work ahead of us as we challenge ourselves against strong prior year growth numbers in the back half of this year.

91. ServiceMaster's common stock price again reacted positively, closing up $3.67, or 7%, on August 6, 2019. Furthermore, it continued to react positively over the next two days, closing up $6.32, or 12%, by August 8, 2019.

92. The statements in ¶¶80-81, 83-87 and 89-90, above, were materially false and/or misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a) The transformation was not being successfully executed in Formosan hot spots, such as Mobile, Alabama, where Defendants' scheme prioritized short-term cost-cutting over customer service initiatives that would drive long-term growth. For example, Terminix routinely failed to provide: (i) an effective initial treatment for Formosan termites; (ii) an effective ongoing treatment for Formosan termites; or (iii) an adequate remediation of Formosan termite infestations suffered by its customers in Formosan hot spots, and particularly in the Mobile, Alabama region. *See supra* at ¶¶53-55. Further, as damages mounted in part because of Terminix's inadequate treatment, Defendants chose to undertake measures to drive away its customers before they could discover an infestation the Company was contractually obligated to remediate, provide its customers with fewer benefits than those to which were entitled, and force its customers to offset the rising litigation costs through raising the cost to renew their contract by as much as 1000% or be left with no protection should their property become infested with termites. *See supra* at ¶¶58-61, 69.

(b) Far from increasing revenue and growth through its focus on customer service, ServiceMaster incurred, and expected to incur, tens of millions of dollars in additional costs

- 30 -

related to Formosan termite damage and the payment of customer claims arising from such damage. *See supra* at ¶¶56, 62-66, 69.

(c)     Defendants' scheme to drive off its customers and cover the costs of damage claims in Formosan hot spots, such as Mobile, drove price increases, not the vague "market conditions" Defendants claimed in their statements to the market on May 7, 2019 described in ¶86. *See supra* at ¶¶58-62, 69.

(d)     Defendants' scheme was intended to decrease customer retention, not to increase retention as Defendants represented in their statements to the market on May 7 and August 6, 2019 described in ¶¶84 and 89.  For example, according to CW1 the dramatic price increases implemented in the beginning of 2018 were intended to compel more than 90% of its customers to cancel their contracts and cover the costs of damages.  As the Alabama Attorney General's Office and ADAI concluded upon finding that Terminix violated the Alabama Deceptive Trade Practices Act, Terminix's price increases prior to and during the Class Period were intended to force customers to "cancel their lifetime protection contracts."  *See supra* at ¶¶58-62, 69.

(e)     As a result, Defendants' statements regarding the successful execution of its customer service transformation and its current and expected financial impact were materially misleading and/or omitted material information necessary to make them not misleading.

**B.     False and Misleading Statements and Omissions Regarding Termite Damage Claims**

93.     Throughout the Class Period, Defendants repeatedly chose to speak to investors about monitoring its damage claims.  As detailed herein, in reality, Defendants caused the accrual associated with termite damage claims to be materially understated, thereby inflating reported EBITDA, by concealing not only the actual claims that had been made by customers due to the Formosan scheme, but also the risk of future claims related to it.

- 31 -

94.    On February 26, 2019, ServiceMaster reported its financial results for 4Q18.  In its release, ServiceMaster provided 2019 adjusted EBITDA guidance of $435 to $445 million.  That same day, ServiceMaster held a conference call with its investors.  During the call, Defendant DiLucente stated that among the "other cost drivers in the quarter" was a "$2 million . . . damage claims expense increase, predominantly related to activity in a section of the Gulf Coast."

95.    As a result of Defendants' positive statements, ServiceMaster's common stock price closed up $6.40, or 16%, on February 26, 2019 on extremely high trading volume.

96.    On March 1, 2019, ServiceMaster filed its annual report on Form 10-K with the SEC, which was signed and certified by Defendants Varty and DiLucente.  The Form 10-K also included a section titled "Significant Accounting Policies," which discussed certain "significant areas requiring the use of management estimates," including "accruals for termite damage claims."  According to the Form 10-K, there were "no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates" with respect to termite damage claims.  The Form 10-K stated in pertinent part:

> The preparation of the consolidated financial statements requires management to make certain estimates and assumptions required under GAAP which may differ from actual results.  The more significant areas requiring the use of management estimates relate to revenue recognition; the allowance for uncollectible receivables; accruals for self-insured retention limits related to medical, workers' compensation, auto and general liability insurance claims; accruals for termite damage claims; the possible outcome of outstanding litigation; accruals for income tax liabilities as well as deferred tax accounts; the deferral and amortization of customer acquisition costs; share based compensation; useful lives for depreciation and amortization expense; the valuation of marketable securities, including the valuation of retained shares of Frontdoor common stock; and the valuation of tangible and intangible assets.  In 2018, there were no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates, other than the valuation of our retained shares of Frontdoor common stock.

97.    The Form 10-K further explained the Company's procedures for accounting for termite damage claim accruals, stating in part:

- 32 -

Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

98.     ServiceMaster's common stock price reacted positively, closing up $4.44, or 9%, on May 7, 2019.

99.     On May 8, 2019, ServiceMaster filed its quarterly report on Form 10-Q for 1Q19, which was signed and/or certified by Defendants Varty and DiLucente. With regard to termite damage claims accruals, the Form 10-Q explained the Company's procedures for accounting for termite damage claim accruals, as described *supra* in ¶¶96-97.

100.    On August 6, 2019, ServiceMaster held a conference call with investors and analysts to discuss its 2Q19 financial results. During the call, when discussing Terminix's incremental margins, Defendant DiLucente reported a figure of 5%, notwithstanding an increase in termite damage claims in the Gulf Coast, stating in part:

There was $2 million in increased damage claims expense primarily due to activity in the Gulf Coast region. We also had $4 million in dis-synergies in the quarter. Excluding the impact of $6 million of dis-synergies and SalesForce's investments in the quarter, the incremental margins for Terminix were approximately 5%.

101.    Defendant DiLucente additionally stated that the Company had "increased the bottom end of [its] free cash flow guidance and now expect[ed] to convert adjusted EBITDA to free cash between 55% and 60%."

102.    When questioned by analysts on the call about year-over-year trends by segment, Defendant Varty described Terminix as "definitely the driver" for positive margin trends in the "second half of the year," stating in part:

- 33 -

Yes.  We definitely have more margin improvement in the second half of the year in Terminix.  I don't think there's a meaningful change in ServiceMaster Brands.  And so that's – so Terminix is definitely the driver.  And we have really consistently said that all along . . . we were going to see lower incremental margins in the first 2 quarters and we're going to slow – trend up particularly in the third and fourth quarter.  So that's the main driver for that trend in the second half.

103.    Also on August 6, 2019, ServiceMaster filed its quarterly report on Form 10-Q with the SEC for 2Q19, which was signed and/or certified by Defendants Varty and DiLucente.  The Form 10-Q contained the same language concerning the accounting practices for termite damage claims accruals as the 1Q19 10-Q detailed in ¶99 *supra*.

104.    Again, ServiceMaster's common stock price reacted positively, closing up $3.67, or 7%, on August 6, 2019.  Furthermore, the common stock price continued to react positively over the next two days, closing up $6.32, or 12%, by August 8, 2019 on high trading volumes.

105.    The statements in ¶¶94, 96-97 and 99-103 *supra* were materially false and/or misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    ServiceMaster's operations and financial results had been and were expected to continue to be materially adversely impacted by extraordinary Formosan termite damage claims in Formosan hot spots, such as Mobile, Alabama, that was exacerbated by Terminix's wrongful course of business.  *See supra* at ¶¶53-56, 58-66, 69.

(b)    Defendants refused to pay its customers' damages claims in whole or in part in Formosan hot spots, such as Mobile, Alabama, absent any legitimate basis.  *See supra* at ¶¶63-64.  For example, Defendants' Director of Termite Damages Claims testified in an arbitration hearing that upon advising a senior Company executive that an Alabama home was never treated and must be demolished and replaced due to Formosan damage, the senior executive refused without any legitimate excuse.  *See supra* at ¶64.

- 34 -

(c)     The Company's refusal to pay its customers' damages, caused in part by the failure to provide inadequate treatment, only increased Defendants' liability.  For example, with regard to the home described in subsection (b), the rebuild that Defendants' refused to honor would have only cost $250,000.  After the claimants took the Company to arbitration during the Class Period, the arbitrator awarded the homeowners and their attorneys approximately $2.8 million, including punitive damages.  *See supra* at ¶65.

(d)     The Company had and continued to incur tens of millions of dollars in additional costs related to Formosan termite damage and the payment of customer claims arising from such damage.  *See supra* at ¶¶56, 62-66, 69.  Leading up to and throughout the Class Period, Terminix was routinely ordered to pay millions of dollars to its customers in private arbitrations for the Company's "systematic and repeated pattern" of failing to fulfill its contractual obligations to its customers, which one arbitrator called "reprehensible," the extent of which was concealed from investors.  *See supra* at ¶¶65-66.

(e)     Defendants' scheme delayed the payments of awards, and the recognition of such losses, absent any legitimate basis.  *See supra* at ¶¶63-64.  For example, shortly before the Class Period, the Company resolved to appeal any award over $1 million to delay payments, regardless of the merits of the appeal.

(f)     Defendants' scheme to drastically increase annual renewal rates, concealed the expected damage claims and exposed the Company to greater liability.  *See supra* at ¶¶53-56, 58-66, 69.  For example, the Alabama Attorney General and ADAI concluded that the price increases were intended in part to pass on expected damages costs to its customers.  *See supra* at ¶61.  In addition, as a result of the unconscionable price increases, the Alabama Attorney General and ADAI

began an investigation into Terminix, which resulted in Terminix being forced to enter into a $60 million settlement. *See supra* at ¶55.

> (g) As a result, Defendants materially understated the accrual associated with damages claims throughout the Class Period and artificially inflated the Company's reported EBITDA.

## C. Defendants' SEC Disclosure Violations

106. Defendants employed the scheme complained of herein in order to artificially inflate the profits of its largest business segment, Terminix. The scheme entailed ServiceMaster not honoring its warranty agreements, not adequately inspecting its customers' homes and businesses and not properly treating its customers' homes and businesses to prevent infestations. As a result, termite damage claims were rising, litigation losses in arbitrations brought by disgruntled customers were resulting in multi-million-dollar damage awards against the Company, and the Company's risk and liability for termite damage claims was far greater than Defendants represented to the market. As the scheme unraveled, Defendants implemented "mitigating" protocols in certain Formosan hot-spots. For example, beginning in 2018, Terminix modified its contracts to provide less coverage to its customers but at the same time drastically increased the price to renew the contracts by as much as 1000%. The purpose of these "mitigation" protocols was to pass the cost of the increasing termite damage claims onto its customers, or simply drive away potential liability by causing customers to cancel their contracts (before discovering a termite infestation) rather than pay the dramatically higher renewal rates. Rather than disclose the increasing risk and liability for termite damage claims as a result of Terminix's failure to provide the pest control services it was contracted to provide, and the financial implications to investors of these increased risks, Defendants misleadingly assured investors that the transformation of Terminix was "bearing fruit" and contributing to increased revenues and EBITDA.

- 36 -

107.    In accordance with the explicit SEC disclosure rules described below, Defendants were required to disclose the Formosan scheme to investors in ServiceMaster's quarterly and annual financial statements filed with the SEC during the Class Period.  In particular, SEC disclosure rules require that every Form 10-K and Form 10-Q contain a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").  Item 303 of Regulation S-K and subsequent SEC guidance set the framework for required MD&A disclosures.  For example, SEC Release No. 33-8350, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, states:

- The MD&A requirements are intended to satisfy three principal objectives:

- to provide a narrative explanation of a company's financial statements that ***enables investors to see the company through the eyes of management***;

- to enhance the overall financial disclosure and ***provide the context within which financial information should be analyzed***; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, ***so that investors can ascertain the likelihood that past performance is indicative of future performance***.

108.    As detailed below, in accordance with the SEC's MD&A rules, Defendants were required to disclose: (a) the impact of the Formosan scheme, and the "mitigating" protocols Defendants implemented on ServiceMaster's ***reported revenues and EBITDA***; (b) the ***material adverse trend*** in termite damage claims as Defendants' scheme unraveled; and (c) the negative impact of the Formosan scheme on ServiceMaster's ***future financial results***.  Defendants failed to make these required disclosures, rendering ServiceMaster's Class Period financial statements materially misleading and in violation of SEC disclosure rules.

### 1.     The Material Adverse Trend in Termite Damage Claims as the Formosan Scheme Unraveled

109.     As ServiceMaster's termite damage claim rates, and the mounting arbitration awards being issued against the Company began to rise, Defendants concealed this adverse trend from investors.  The material adverse trend in ServiceMaster's termite damage claim rates and litigation losses was explicitly required to be disclosed under the SEC's MD&A rules, which establish the following disclosure requirements set forth in Item 303 of SEC Regulation S-K:

- ***Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations***.[6]

110.     As described in ¶¶116-118 and 121-124, Defendants later admitted the material adverse trend in termite damage claims.  On October 22, 2019, Defendants revealed that the "termite damage claims arising primarily from Formosan termite activity" "concentrated in Mobile, Alabama," had "been increasing over the last few years," unbeknownst to investors during the Class Period.  Defendants' awareness of this material adverse trend while concealing it from investors is in direct contravention of the SEC's stated objective for the MD&A to "provide a narrative explanation of a company's financial statements that ***enables investors to see the company through the eyes of management***."

### 2.     The Impact of the Unsustainable Formosan Scheme on ServiceMaster's Future Results

111.     Defendants were aware that ServiceMaster's Formosan scheme was unsustainable and that the unraveling of the scheme would have a material adverse impact on ServiceMaster's future revenues and EBITDA.  Specifically, Defendant Varty informed the market that the uptick in claims – which he revealed had occurred "[i]n the past few years" – had increased termite damage

---

[6]     17 C.F.R. §229.303(a)(1)-(3).  *See also* SEC Release No. 33-8350.

claims costs and impacted termite revenue by 7% to 8%, up from the historic numbers of 4% to 4.5%. Defendant Varty also stated that the increased claims would continue to impact the Company throughout 2020.

112.    The material impact of ServiceMaster's Formosan scheme on ServiceMaster's future financial results was explicitly required to be disclosed under the SEC's MD&A rules. The SEC has explicitly stated that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a ***particular emphasis on the registrant's prospects for the future***."[7]

113.    Likewise, the SEC Staff has stated:

- MD&A must specifically focus on known material events and uncertainties that would cause reported financial information ***not to be necessarily indicative of future operating performance*** or of future financial condition.

                    *          *          *

- One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, ***so that investors can ascertain the likelihood that past performance is indicative of future performance***.[8]

114.    As discussed herein, Defendants were aware that during the Class Period ServiceMaster's termite damage claims rates were increasing precipitously and ServiceMaster had significant exposure to future termite damage claims as a result of its failure to provide the termite abatement services required by its contracts with its customers. For example, due to the Formosan scheme, and the "mitigating" protocols implemented by Defendants, ServiceMaster's termite damage claims were rising, multi-million dollar arbitration awards were being levied against the

---

[7]    SEC SAB 104 at 76.

[8]    SEC Release Nos. 33-8350, 34-48960; FR-72.

Company and the risk of future termite damage claims because of ServiceMaster's Formosan scheme was greater than Defendants represented to the market. This negative termite damage claim "trend," which was then adversely impacting and was reasonably expected to continue to have a material adverse impact on ServiceMaster's future revenue and EBITDA, was concealed from investors in violation of SEC disclosure rules. As stated above, SEC disclosure rules required ServiceMaster to inform investors about its "***prospects for the future***" and that its reported financial information may not be ***necessarily indicative of future operating performance*** due to the adverse termite damage claim trend, of which Defendants were aware.

## VI.    LOSS CAUSATION AND ECONOMIC LOSS

115.    During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme and wrongful course of conduct, and made false and misleading statements and/or omitted material information concerning the state of Terminix's business. Such conduct and statements and/or omissions were designed to and did artificially inflate, maintain and manipulate the price of ServiceMaster common stock and deceived Lead Plaintiff and the Class, causing purchasers of ServiceMaster common stock to suffer economic harm as the truth reached the market. When the circumstances concealed by Defendants' scheme and prior misrepresentations and omissions began to come out, it caused the price of ServiceMaster common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of ServiceMaster common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

116.    On October 22, 2019, ServiceMaster announced its preliminary financial results for 3Q19. In addition to missing revenue and earnings estimates for the quarter, ServiceMaster reported net income of only $25 million as compared to $71 million during the third quarter of the prior year. The Company also gave adjusted EBITDA guidance of $415-$425 million, down from $435-

$445 million.  The release also announced the sudden departure of the President of Terminix Residential, Stevenson.

117.    The release attributed the poor results to "termite damage claims arising primarily from Formosan termite activity" "concentrated in Mobile, Alabama," which had "been increasing over the last few years."  The Company further stated that these were known "trends" and that ServiceMaster had been taking measures to mitigate the trends since early 2018:

> The increase in termite damage claims includes the resolution of a single $2 million termite damage claim from 2016.  Termite damage claims can take years to fully settle, and timing can be difficult to forecast.  Assuming the continuation of recent trends, the company expects higher claims costs to continue in the short-term due to increased claims activity.  Formosan termite activity has been increasing over the last few years, however due to a number of climatic and environmental factors it remains largely concentrated in the Mobile, Alabama area of the country, which represents less than one percent of Terminix revenue.  Starting in 2018, the company initiated mitigating actions to limit our future exposure, including third party claims management, reinforcement of effective processes, improved documentation, and a change in pricing structure.  We have undertaken several other operational changes over the last 18 months and are confident that we can continue to manage the impact of termite damage claims within our projected long-term 30 percent incremental margins.

118.    The release further indicated that the Company's reduction in adjusted EBITDA guidance had been impacted by several factors, including a "$10 million reduction from the impact of termite damage claims" and "$10 million from targeted revenue reductions principally in the Mobile, Alabama area."  The release also stated that ServiceMaster had suffered "a reduction in termite renewals driven partially by managed reductions from price increases in the Formosan termite market of Mobile, Alabama."

119.    Analysts were shocked by this admission.  For example, *The Buckingham Research Group* noted in an October 22, 2021 report:

> ***Termite claims are popping up seemingly out of the blue in Alabama*** . . . .
> We saw some lawsuits filed but we saw no evidence of any trouble in SERV's numbers until the preannouncement earlier this week. . . . ***Terminix is nowhere near as far along in its transformation progress as we thought***.

- 41 -

Similarly, on October 22, 2019, *Morgan Stanley Research* also reported that the new damage claims costs "were not anticipated" by investors.

120.     On this news, the price of ServiceMaster common stock dropped $11.44 per share to close at $44.70 per share on October 22, 2019, a decline of over 20% on unusually high trading volume.  The price of ServiceMaster common stock continued to fall, on heavy trading volumes, losing an additional $4.13, or another 7%, per share by November 5, 2019.

121.     Then on November 5, 2019, ServiceMaster issued a release announcing its final 3Q19 financial results.  In the release, the Company discussed its "'challenging quarter,'" revealing that it had been impacted by certain "legacy risks," including "termite damage claims."

122.     That same day, Defendants held a conference call with investors and analysts to discuss the results.  On the call, Defendants gave more information concerning the termite damage claims suffered by the Company.  Specifically, Defendant Varty informed the market that the uptick in claims – which he claimed had occurred "[i]n the past few years" – "[had] increase[d] our termite damage claims costs" and impacted termite revenue by "7%-8%," up from the historic numbers of "4%-4.5%."  Defendant Varty also stated that the increased claims would continue to impact the Company throughout 2020, stating in part:

> The profitability levels of the business have historically included spending approximately 4% to 4.5% of termite revenue annually in the settlement of these termite damage claims nationally.  And the base of our business outside of the Mobile, Alabama area continues to operate at these historical levels.  Most of these claims are handled directly with the customer and involve relatively minor repairs, but a few occasionally involve litigation and the payment of damages.
>
> In the past few years, we have seen an increase in the number and average cost of termite damage claims in the Mobile, Alabama area related to Formosan termite activity.  We also have seen an increase in the number of termite damage claims in that region that involve litigation.  These 2 trends have increased our termite damage claims cost as a percentage of termite revenue to between 7% and 8%.  Given the increased volume we have seen, we expect additional cost increases in 2020 before our mitigating actions fully take effect and we begin to gradually return them to historical norms.

- 42 -

123.    In addition, Defendant Varty disclosed that the price increases in Mobile, Alabama were part of an initiative to "mitigate" termite damage claims by "limit[ing] [the Company's] legacy risk exposure."  Further, Defendant Varty stated that only now was ServiceMaster employing a "quality assurance team" to oversee the inspection and retreatment associated with customer contract renewals, stating in part:

> At the beginning of 2019, we began a pricing initiative in the Mobile, Alabama area to better align the cost we . . . charge termite customers with the actual cost we incur to provide services in the area.  We anticipated some customer reductions as a result of the pricing change, but they have accelerated faster than we originally projected and, as a result, are impacting termite renewal revenue and profitability in the short term.  As these customers renew their contracts, we conduct a detailed inspection and when necessary, re-treat their properties.  We have added a dedicated quality assurance team that is solely devoted to these inspections and re-treatments.

> Another key initiative was to increase awareness of these issues in the area and train technicians more effectively on inspection methods to identify and document aspects of Formosan termite activity that are different from subterranean termites.  The inspection and documentation process is vital to ensure we set customer expectations regarding property damage that may predate our treatment and conducive conditions that may limit our treatment's effectiveness.

> Another action we have taken is to improve our claims management process through a third-party administrator.  This administrator helps us settle any new claims that may arise at a faster pace than our historical norms.

124.    Finally, Defendant DiLucente stated that, in addition to "$2 million in increased damage claims expense due to the increased Formosan termite activity in Mobile, Alabama," the Company "expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter."

125.    On this news, the price of ServiceMaster common stock declined another $4.83, or 12%, between the closing price on November 5, 2019 and November 6, 2019 on unusually heavy trading volumes.

126.     The declines in the price of ServiceMaster common stock after these disclosures were a direct result of the revelation of the nature and extent of Defendants' scheme and fraudulent misrepresentations and omissions to investors and the market.  The timing and magnitude of the price declines in ServiceMaster common stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and maintain the price of ServiceMaster common stock and the subsequent significant decline in the value of ServiceMaster common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

127.     Because of Defendants' undisclosed scheme and pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

128.     Lead Plaintiff's claims for securities fraud are also asserted, in part, under the fraud-on-the market theory of reliance.  The market price of ServiceMaster common stock regularly traded on the NYSE and was artificially inflated by the false and misleading statements and omissions complained of herein.   Defendants' false statements and omissions inflated the price of ServiceMaster common stock both before and during the Class Period.

129.     The Class Period inflation in the price of ServiceMaster common stock was eliminated when the financial conditions, business risks and other information concealed by Defendants' fraud was revealed to the market.  The information did not reach the market all at once

but leaked out through several partial disclosures, each of which partially corrected the market price of ServiceMaster common stock.

130. At all relevant times, the market for ServiceMaster common stock was an efficient market for the following reasons, among others:

(a) ServiceMaster met the requirements for listing, and were listed and actively traded, on the NYSE, a highly efficient and automated market;

(b) During the Class Period, a high volume of ServiceMaster common stock traded on the NYSE;

(c) As a regulated issuer, ServiceMaster filed periodic public reports with the SEC and NYSE;

(d) ServiceMaster regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other internet sites, and through other wide-ranging public disclosures such as conference calls, communications with the financial press and other similar reporting services;

(e) During the Class Period, ServiceMaster was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by Defendants about ServiceMaster. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f) ServiceMaster had substantial institutional ownership during the Class Period. These institutions analyzed and reported on the publicly available information about ServiceMaster and its operations.

- 45 -

131.    Through the foregoing mechanisms, the information publicly disseminated by Defendants about ServiceMaster and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in ServiceMaster common stock, the information disseminated by Defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of ServiceMaster common stock.

132.    Under these circumstances, all purchasers of ServiceMaster common stock during the Class Period suffered similar injury through their purchase of ServiceMaster common stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## VIII.   CLASS ACTION ALLEGATIONS

133.    Lead Plaintiff brings this action on behalf of all purchasers of ServiceMaster common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns and any entity in which any of the Defendants have or had a controlling interest.

134.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ServiceMaster common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class located geographically throughout the country.  Joinder would be highly impracticable.  Record owners and other members of the Class may be identified from records maintained by ServiceMaster, its transfer agent or securities brokers and custodians.

Class members may be notified of the pendency of this action by mail and/or electronic communications, using the form of notice similar to that customarily used in securities class actions.

135.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

136.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interest antagonistic to or in conflict with those of the Class.

137.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants engaged in a scheme to defraud;

(c)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)    whether the price of ServiceMaster common stock was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and

(e)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

4838-5795-0704.v1

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

139.   Lead Plaintiff incorporates ¶¶1-138 by reference.

140.   During the Class Period, Defendants engaged in a scheme to defraud and disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ServiceMaster common stock during the Class Period.

142.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ServiceMaster common stock, and suffered losses when the relevant truth was revealed.  Lead Plaintiff and the Class would not have purchased ServiceMaster common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and scheme.

- 48 -

4838-5795-0704.v1

143.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of ServiceMaster common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against the Individual Defendants)

144.   Lead Plaintiff incorporates ¶¶1-143 by reference.

145.   During the Class Period, the Individual Defendants acted as control persons of ServiceMaster within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions as officers and/or directors of ServiceMaster, their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the scheme and statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the operation of the scheme and the content and dissemination of the statements that Lead Plaintiff contends are false and misleading.  These Defendants were provided with or had unlimited access to copies of the Company's statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.   Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.      Awarding Lead Plaintiff and the members of the Class damages and interest;

C.      Awarding Lead Plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## X.    JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: June 28, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
RACHEL A. COCALIS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
rcocalis@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4838-5795-0704.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 28, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
   & DOWD LLP
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

E-mail:  cwood@rgrdlaw.com

4838-5795-0704.v1

# Mailing Information for a Case 2:20-cv-02553-STA-tmp Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Rachel A. Cocalis**
  rcocalis@rgrdlaw.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com

- **Jason Gerstein**
  jgerstein@mwe.com

- **Jason Daniel Gerstein**
  jgerstein@mwe.com

- **Alexandra M. Ortiz Hadley**
  alexa.ortiz@butlersnow.com,colleen.casner@butlersnow.com,paula.graves@butlersnow.com

- **John C. Hayworth**
  John.Hayworth@butlersnow.com,Sandra.Carlton@butlersnow.com,melna.vanbeber@butlersnow.com,ECF.Notices@butlersnow.com

- **Timothy Hoeffner**
  thoeffner@mwe.com

- **Timothy E. Hoeffner**
  thoeffner@mwe.com

- **Andre B. Mathis**
  andre.mathis@butlersnow.com,tina.schubert@butlersnow.com,ecf.notices@butlersnow.com

- **Danielle S. Myers**
  danim@rgrdlaw.com

- **John Tate Spragens**
  john@spragenslaw.com,spragenslaw@ecf.courtdrive.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com

- **Christopher Martin Wood**
  cwood@rgrdlaw.com,9101599420@filings.docketbird.com,e_file_sd@rgrdlaw.com,PAnderson@rgrdlaw.com,kjohnson@rgrdlaw.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,DebraW@ecf.courtdrive.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)