**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| TEAMSTERS LOCAL 237 WELFARE FUND, individually and on behalf of Others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-02553-STA-tmp |
| | ) | |
| SERVICEMASTER GLOBAL HOLDINGS, INC. et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING JOINT MOTION TO DISMISS**

This is a securities fraud action based on allegedly misleading statements made by a corporation and its CEO and CFO about the extent of the company's legal exposure and liabilities, both of which had the effect of overstating the company's profitability. Before the Court is Defendants Terminix Global Holdings, Inc. (f/k/a ServiceMaster Global Holdings, Inc.), Nikhil M. Varty, and Anthony D. DiLucente's Joint Motion to Dismiss the Amended Complaint (ECF No. 63). Plaintiff Teamsters Local 237 Welfare Fund has filed a response in opposition, and Defendants have submitted a reply brief. While the Amended Complaint plausibly alleges that Defendants made some misleading statements, the Amended Complaint does not allege a strong inference of scienter. For the reasons that follow, the Joint Motion to Dismiss is **GRANTED**.[1]

---

[1] Lead Plaintiff argues in its response brief that the Joint Motion to Dismiss did not argue for the dismissal of all of the claims stated in the Amended Complaint. The Court discusses the scope of the Joint Motion to Dismiss in more detail below.

# BACKGROUND

## I. Procedural History

On June 1, 2020, Plaintiffs filed a Complaint, alleging securities fraud claims on behalf of a class of investors against Defendant ServiceMaster Global Holdings, Inc. and the company's senior executives for violations of the Securities Exchange Act of 1934 ("the 1934 Act"). Compl., June 1, 2020 (ECF No. 1). The initial Complaint specifically alleged its claims "on behalf of all purchasers of ServiceMaster common stock between February 26, 2019 and November 4, 2019 . . . ." *Id.* ¶ 1. Plaintiffs alleged violations of two specific sections of the 1934 Act, (1) §10(b) of the 1934 Act and Rule 10b-5, and (2) § 20(a) of the 1934 Act. Plaintiffs brought suit in the United States District Court for the Middle District of Tennessee. Shortly after the filing of the initial Complaint, Defendants filed a motion to transfer the action to the Western District of Tennessee, arguing that Defendant ServiceMaster has its principal place of business in Memphis, Tennessee, and the company's senior executives lived and worked in Memphis. *See* Defs.' Mot. to Transfer, July 6, 2020 (ECF No. 32). On July 30, 2020, U.S. District Judge Aleta Trauger granted the motion and transferred the case to this Court. *See* Order Granting Mot. to Transfer, July 30, 2020 (ECF No. 44). On March 8, 2021, U.S. District Judge John T. Fowlkes transferred the case once more to the undersigned. Order of Transfer, Mar. 8, 2021 (ECF No. 55).

On May 13, 2021, the Court entered an order appointing Teamsters Local 237 as lead plaintiff and its chosen counsel Robbins Geller Rudman & Dowd LLP as Lead Counsel. Order Appointing Lead Pl. and Scheduling Order, May 13, 2021 (ECF No. 59).[2] As part of its ruling,

---

[2] Soon after Teamsters Local 237 filed suit, Scott Torppey, a putative member of the prospective class on behalf of whom Teamsters Local 237 brought the action, filed a Motion for Appointment as Lead Plaintiff (ECF No. 10). Torppey requested that the Court appoint him as lead Plaintiff to represent the class and his chosen attorneys as lead counsel and liaison counsel. The same day Torppey filed his Motion for Appointment, Teamsters Local 237 filed its own Motion

the Court ordered that all securities class actions against any or all of the Defendants subsequently filed in, or transferred to, this District were to be consolidated with this action, though to date no further actions have been filed or transferred, as far as the Court is aware.  The Court also adopted a scheduling order with case management deadlines proposed by the parties.  As part of the schedule, the Court gave Lead Plaintiff 45 days in which to file a consolidated amended complaint, in recognition of the custom that the lead plaintiff, once appointed as such by the Court, files an amended pleading after the appointment.  *Id*.  Defendants then had 45 days from the service of the consolidated amended complaint in which to file any motion to dismiss.  Lead Plaintiff was given 45 days to respond to the forthcoming Rule 12(b) motion, and Defendants had 30 days to submit their reply.  *Id*.  Lead Plaintiff filed the Amended Complaint (ECF No. 60) on June 28, 2021.  Defendants filed a Joint Motion to Dismiss the Amended Complaint (ECF No. 63) on August 12, 2021, and the parties have now fully briefed the Joint Motion.

## II. Amended Complaint for Violation of the Federal Securities Laws

For purposes of Defendants' Rule 12(b)(6) Motion to Dismiss, the Court accepts the following well-pleaded allegations of the Amended Complaint as true.  Lead Plaintiff alleges a "securities fraud class action on behalf of all purchasers of ServiceMaster Global Holdings, Inc. ('ServiceMaster' or the 'company') common stock between February 26, 2019 and November 4, 2019, inclusive (the 'Class Period'), seeking to pursue remedies under the Securities Exchange

---

for Appointment as Lead Plaintiff (ECF No. 13), asking the Court to appoint it as lead Plaintiff and its chosen counsel as class counsel. Torppey later withdrew his Motion for Appointment and stated that he did not oppose the appointment of Teamsters Local 237 as lead Plaintiff. *See* Notice of Non-Opposition, June 23, 2020 (ECF No. 23). Defendants took no position on the appointment of a lead Plaintiff. The Court found Torppey's Motion for Appointment to be moot in light of his lack of opposition to the appointment of Teamsters Local 237 as lead Plaintiff and therefore denied the Motion.

Act of 1934 ('1934 Act') and SEC Rule 10b-5 promulgated thereunder." Am. Compl. ¶ 1 (ECF No. 60).

According to Lead Plaintiff, ServiceMaster provided termite, pest control, cleaning, and restoration services for residential and commercial customers through a network of more than 8,000 company-owned locations, franchises, and license agreements. *Id.* ¶¶ 2, 21. Terminix, ServiceMaster's largest and most profitable business segment, was a termite and pest control business that operated primarily in the United States. *Id*. ¶ 22. Approximately 80% of Terminix's revenue was generated from the annual renewal of customer contracts, making customer retention vital to ServiceMaster's financial health. *Id.* ¶22. As part of its efforts to attract and retain customers, Terminix offered an annual termite coverage plan for its customers. To enter into such plans, Terminix offered a complimentary initial inspection to assess whether the property had an existing termite infestation and to determine customer eligibility for coverage. *Id.* ¶ 23. Upon entering into the contract, Terminix provided another inspection annually and further inspections on an as-needed basis. *Id.* Should termites be discovered at any time, the coverage plan obligated Terminix to eliminate the infestation at no cost to the customer and cover the costs of further treatment as well as damages and repairs to the customer's property. *Id.*

According to the Amended Complaint, the Terminix business was essential to ServiceMaster. *Id.* ¶ 24. In 2017, Terminix represented more than 50% of ServiceMaster's total revenue. *Id*. In October 2018, Terminix became even more critical to ServiceMaster's success as ServiceMaster spun off its American Home Shield business, which represented 40% of ServiceMaster's total revenue in FY17. *Id.* By the time the Class Period began on February 26, 2019, the Terminix business represented approximately 87% of ServiceMaster's revenues and nearly 80% of EBITDA. *Id.* ¶¶ 2, 24. Based on the fundamental and increasing importance of

Terminix to ServiceMaster, information regarding Terminix provided critical insight for analysts' and investors' evaluations of the company's financial condition and growth during the Class Period. *Id.* ¶ 26.

In the years immediately preceding the Class Period, Terminix's growth had faltered. *Id.* ¶ 27. For example, organic revenue growth for Terminix slowed, and in FY17, adjusted EBITDA in the Company's Terminix segment declined to $330 million, an 11% year-over-year decline. *Id.* This ongoing decline posed a serious risk to ServiceMaster. *Id.* ¶ 28. For example, a February 23, 2017, report from RBC Capital Markets identified "Terminix growth [as] the primary issue" for ServiceMaster in 2017. *Id.* Similarly, a July 17, 2018 J.P. Morgan analyst report explained, "Terminix organic revenue growth remains the key variable for the S[erviceMaster] stock[.]" *Id.* According to analysts, the root of Terminix's poor growth was customer service and customer retention. *Id.*

Recognizing that Terminix's growth had been slowing and that Terminix was essential to ServiceMaster's financial success, ServiceMaster assured its investors it would make a change. *Id.* ¶ 29. ServiceMaster hired a new executive team to implement the transformation: Defendant Nikhil M. Varty ("Varty") as Chief Executive Officer ("CEO") and Defendant Anthony D. DiLucente ("DiLucente") as ServiceMaster's Chief Financial Officer ("CFO"). *Id*. ¶ 2. As Defendant DiLucente explained at the 2018 Analyst Day, for years Terminix focused on "short-term profitability," rather than "long-term sustainable organic growth through outstanding customer service." *Id.* ¶ 30. Therefore, "in 2017, [ServiceMaster] realized it was time for a change. And that change required a new dynamic leader, [so] Nik Varty joined the company . . . and a new strategy, which is the Terminix transformation . . . ." *Id.* Defendant Varty explained to investors during ServiceMaster's 3Q 2017 webcast presentation on October 31, 2017, that the goal of the

Terminix transformation was to "[d]eliver consistently strong revenue and earnings growth." *Id.* ¶

31. To accomplish this goal, ServiceMaster would focus on five activities: (1) "Build[ing] a Strong

Leadership Team;" (2) "Driv[ing] accountability;" (3) "Empower[ing] our technicians to deliver

an exception[al] customer experience;" (4) "Develop[ing] a Strong Commercial Business;" and

(5) "Implement[ing] [a] disciplined, Lean Six Sigma Approach." *Id.*

During the presentation, Defendant Varty further elaborated on the five steps of the

transformation:

> At Terminix, we are taking a disciplined approach to executing a series of
> systematic transformational activities to significantly upgrade the customer
> experience, improve our customer retention rates and profitably grow our market
> share. We are building a strong leadership team, with significant experience in
> delivering results and driving profitable growth . . . At the same time, we are
> creating an organizational structure that enhances personal accountability and
> supports a high-performance culture. We are empowering our route technicians to
> deliver an exceptional customer experience by giving them the tools they need to
> improve customer engagement while providing them with timely customer
> feedback . . . . We will develop a strong commercial business to better able to focus
> on and serve commercial customers . . . We will implement a disciplined, Lean Six
> Sigma approach to enhance efficiency, to significantly improve customer levels,
> strengthen our investment discipline and drive profitable growth. We are enhancing
> our ability to consistently deliver on our commitments by increasing our
> transparency, improving operational cadence and measurement systems and
> strengthening business processes with a goal of creating long-term sustainable
> value.

In addition to hiring Defendant Varty as CEO, as part of its transformation ServiceMaster

replaced several key senior management roles, appointing DiLucente as ServiceMaster's CFO,

Pratip Dastidar ("Dastidar") as ServiceMaster's Senior Vice President and Chief Transformation

Officer, and Matt Stevenson as President of Terminix Residential. *Id.* ¶ 32. Given that

approximately 80% of Terminix's revenue was generated from the annual renewal of customer

contracts, Defendants told investors at its 2018 Analyst Day shortly before the Class Period that

Terminix's transformation was dedicated to improving growth through a focus on customer service

and operations, and that Terminix's "transformation efforts are on track." *Id.* ¶ 33.  For example,
Defendant Varty highlighted that "in 2018, we were able to demonstrate that all the actions we
were taking, all the transformation that we launched . . . is bearing fruit." *Id.* ¶ 34. He also stated
that the transformation efforts would "create the sustainable organic growth that we need." *Id.*
Echoing Defendant Varty, Defendant DiLucente represented that "the Terminix transformation . .
. will help drive sustainable organic growth." *Id.*

Moreover, Defendant Varty and Defendant DiLucente highlighted the transformation's
impact on Terminix Residential, particularly on the critical issue of customer retention. *Id.* ¶ 35.
For example, Defendant Varty advised:

> with the transformation efforts on track, you can see when a team, an incredible
> team puts its attention on something like [R]esidential pest, we were able to show
> some handsome growth in the right direction, and this is with all the leading
> indicator[s] starting to point in the right direction.

*Id.* Similarly, Defendant DiLucente explained that the transformation efforts in the Residential
segment were centered on:

> better customer engagement . . . . And you can see the area, where we were actually
> showing declining growth has now turned positive. And in particular in the third
> quarter of 2018, we delivered 7.8% growth in the residential pest control segment
> The real opportunity, as Matt [Stevenson] talked about, is retention.

> *Id.* ¶ 36.

Moreover, Defendant DiLucente reassured investors that Terminix would continue its "laser
focus" on customer retention in 2019, which would "fuel us and propel us further." *Id.* ¶ 37.

Analysts reporting on ServiceMaster's Analyst Day highlighted the Company's assurances
that the transformation was "on track" and that Terminix was the key driver of revenue growth for
2019:

> • "Investor Day takeaways: helpful color on transformation initiatives and path to
> industry growth rates – ALERT . . . Yesterday we attended ServiceMaster's

Investor Day in NYC. The helpful presentations reviewed growth drivers and market opportunities for the company's Terminix and ServiceMaster Brands ("SB"; fka Franchise Services Group) segments, including a particular focus on the company's transformation within Terminix." J.P. Morgan Chase & Co. (Dec. 10, 2018).

• "Transformation Continues. . . . We recently attended SERV's Investor Day in New York, where management focused on the ongoing transformation occurring at SERV. . . . SERV's primary focus remains accelerating Terminix growth." Morgan Stanley (Dec. 12, 2018).

*Id.* ¶ 38.

Because Terminix was critical to ServiceMaster's financial growth, Defendants worked during the Class Period to convince ServiceMaster investors that Terminix was turning around through customer service initiatives and was driving growth and profit in 2018 and 2019. *Id.* ¶ 39. Defendants' assertions at its Analyst Day that it was successfully executing the Terminix transformation were bolstered a few months later when the Company announced its FY18 financial results. *Id.* ¶ 40. In a release on the first day of the Class Period, February 26, 2019, Defendant Varty told investors that Terminix's transformation "efforts" resulted in "record revenue" and "unlock[ed] the potential to drive sustainable revenue growth." *Id.* Varty reiterated similar comments, comments the Court analyzes in more depth below, as part of the company's conference call with investors later the same day. *Id.* ¶ 42.

Analysts reported on these developments positively. *Id.* ¶ 43. For example, in a February 26, 2019 report, J.P. Morgan raised its price target following the statements, stating, "4Q18 provided further evidence that [management] is prudently rebuilding the fundamentals of the company's flagship pest control business . . . and suggests 2-3% is just a stepping stone to faster growth . . . . Terminix growth shines." *Id.* A February 26, 2019, report from William Blair stated, "[W]e are beginning to see some benefit from management's new strategic direction. We expect

recent investments in new systems and processes to drive further improvements in retention as Terminix moves through fiscal 2019." *Id.* As a result of Defendants' positive statements, ServiceMaster's common stock price closed up $6.40, or 16% on February 26, 2019 on extremely high trading volume. *Id.* ¶ 43.

Throughout the Class Period, Defendants assured investors that they were monitoring the level of termite damage claims. *Id.* ¶ 44. For example, Defendants' annual and quarterly SEC filings, signed by Defendants Varty and DiLucente, provided information regarding ServiceMaster's accounting for termite damage claim accruals. *Id.* The "Significant Accounting Policies," section of ServiceMaster's FY18 Form 10-K discussing "accruals for termite damages claims" stated that there were "no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates," with respect to termite damage claims. *Id.*

During the Class Period, Defendants also stated that pricing changes were due to favorable market conditions and margins that would continue to improve in the second half of 2019. *Id.* ¶ 45. For example, in response to an analyst's question regarding increased pricing on a May 7, 2019 earnings call, Defendant DiLucente stated

> I think the latter explanation you gave [of the 'market' being 'supportive of better pricing'] is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – would be [sic] bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily. So [a] pretty typical thing for us.

*Id.* Analysts reported that they were encouraged by Defendants' statements. *Id.* ¶ 46. For example, a May 7, 2019, report from J.P. Morgan stated,

> In our view, the Terminix turnaround feels as solid as ever, with 1Q19 providing further evidence that m[anagement] is prudently rebuilding the fundamentals of the company's flagship pest control business – both in residential

and commercial markets – and we see mid-single digit organic revenue growth coupled by expanding margins on the horizon.

• Continued progress in the turnaround. In 1Q19, the flagship Residential Pest Control segment grew +4.3% organically, driven by strength in price realization . . . .

*Id.* Again, ServiceMaster's common stock price reacted positively, closing up $4.44, or 9%, on May 7, 2019. *Id.*

The Amended Complaint alleges that Defendants were engaged in a fraudulent scheme that was hindering Terminix's transformation, and the Company's overall growth, as well as increasing the Company's risk and liability for customer termite warranty claims. *Id.* ¶ 47. Defendants' scheme included: (a) providing inadequate termite protection and remediation to its customers in Formosan hot spots, such as Mobile, Alabama; and (b) covering up the scope and impact of Formosan damage claims by: (i) refusing and/or delaying the payment of claims and damage awards, in whole or in part, absent a legitimate basis; and (ii) implementing "mitigating" protocols in certain Formosan hot spots, like Mobile, Alabama, which involved modifying renewal contracts with customers to provide fewer services at the same time as increasing the cost to renew as much as 1000% in an effort to drive away customers before they could discover their property was infested by termites. *Id.* ¶ 48. By concealing this scheme, Defendants misled investors about the true state of Terminix's business, ServiceMaster's progress on the "transformation," and the true nature of Terminix's growth. *Id.* Additionally, by concealing the actual claims that had been made by customers due to the Formosan scheme, and the risk of future claims related thereto, ServiceMaster materially understated the accrual associated with this liability, thereby overstating the Company's reported EBITDA. *Id.*

Lead Plaintiff alleges that several decades ago, the Formosan species of termite, commonly referred to as the "super termite," was first introduced to the United States. *Id.* ¶ 49. Since then,

the Formosan termite has been considered the most aggressive and economically devastating species of termite in the United States, causing approximately $1 billion a year in property damage. *Id.* Like other subterranean termites, the Formosan termite feeds on materials that contain cellulose, but because of its larger colony size, the Formosan termite attacks a greater variety of wood at a faster rate than subterranean termites native to the United States. *Id.* The Formosan termite also has an enormous reproductive capacity, with a typical colony easily exceeding one million insects. *Id.*

In the United States, the Formosan termite exists in warm, humid climates, and is most commonly found in Gulf Coast states, such as Alabama, Florida, Georgia, Louisiana, Mississippi and Texas. *Id.* ¶ 50. The Formosan termite has also been found in North Carolina, South Carolina, Hawaii and California. *Id.* Similar to subterranean termites, the Formosan termite constructs shelter tubes out of mud to travel from its underground nest to a food source. *Id.* ¶ 51. The Formosan termite also uniquely constructs above-ground nests within the structures it infests. *Id.* In the context of a structural infestation, these nests are typically found within walls and are referred to as "cartons" in the pest control industry. *Id.* The possibility of both a Formosan nest close to a structure and an above-ground nest within the structure can greatly increase the damage potential of these termites. *Id.* As a matter of pest control, it is necessary to closely monitor and promptly treat any sign of Formosan termite activity. *Id.*

According to the Amended Complaint, property owners in at-risk areas relied heavily on Terminix's annual protection contracts to safeguard against catastrophic damage from a Formosan termite invasion. *Id.* The protection Terminix provided, however, was inadequate. During the entirety of the "transformation" and throughout the Class Period, Formosan termites were the greatest problem facing Terminix. *Id.* ¶ 52. Unbeknownst to investors, the substantial Formosan

termite infestation was exacerbated by Terminix's systematic failure to adequately treat homes and businesses in at-risk areas for these super termites. *Id.* Not only did Terminix routinely fail to perform initial inspections or provide adequate Formosan termite treatment for its customers in hot spots, it also failed to conduct proper required follow-up inspections or retreatments. *Id.*

For example, a confidential witness ("CW1") worked at Terminix between 2017 and 2019, analyzing sales trends and setting pricing in order to maximize Terminix's profitability. *Id.* ¶ 53 n.1. CW1's work involved analyzing customer claims for Formosan termite damage. *Id.* CW1 stated that Terminix's representatives were not incentivized to do proper initial inspections and thus did a poor job of inspecting its customers' homes and businesses. *Id.* ¶ 53. CW4, a Mobile, Alabama branch manager from 2009 to 2018, stated that a random sample of customer contracts in CW4's branch revealed that 40% of properties had not been treated properly or at all in the years leading up to the Class Period. *Id.* Attorneys for claimants in a private arbitration reported after the Class Period that Terminix did not properly treat homes 96% of the time. *Id.* CW4 confirmed that Terminix consistently undertreated properties in Mobile, Alabama. *Id.* For example, if a property should have been treated with 600 gallons of pesticide, Terminix cut costs and may have only used 100 gallons. *Id.*

Recent arbitration testimony of Alabama branch managers and a regional manager revealed that, prior to the Class Period, the branches conducted studies of the claims rate in these areas and discovered that incomplete and worn-off treatments were causing huge amounts of damage. *Id.* ¶ 54. Accordingly, the managers, Steve Barnett, Tom Hodges and Terry Henson, recommended procedures to provide adequate treatment. *Id.* Terminix's executives, however, refused to implement these changes and instead fired the managers. *Id.* Substantiating these claims, an "investigation by the Alabama Attorney General's office and [ADAI]," released after the Class

Period, confirmed "that Terminix . . . failed to deliver or provide the termite protection services" promised to its Alabama customers, and "[a]s a result, many homes and businesses suffered [Formosan] termite infestation." *Id.* ¶ 55 (citing Steve Marshall, Alabama Attorney General, *Attorney General Steve Marshall Announces $60 Million Settlement with Terminix Over Illegal Business Practices Targeting Alabama Consumers* (Nov. 5, 2020), available at https://www.alabamaag.gov/NewsViewer/69822281-8337-40ec-8761-d603f91f10a6.)   On November 5, 2020, "[a]fter being confronted with the evidence of its illegal acts," Terminix agreed to a $60 million settlement. *Id.* ¶ 55 n.2. Specifically, Terminix agreed, among other things to: (1) set aside $25 million for customers that were subjected to these unconscionable price increases on renewed contracts prior to and during the Class Period; (2) set aside $10 million to retreat 12,000 of its customers' homes in Mobile and two other at-risk Alabama counties; and (3) provide "[n]ew, competent, and complete inspections of homes in the areas affected by Formosan termites." *Id.*

In the years leading up to the Class Period, Terminix was beset by costly termite litigation, primarily related to Formosan termite activity in Mobile, Alabama. *Id.* ¶ 56. According to CW1, the litigation claims were so overwhelming in Alabama that Terminix's outside counsel had to work out a scheduling agreement limiting counsel to trying 26 cases a year so that it would have at least one week for preparation between trials. *Id.* As a result of this limitation, by 2017, years of nonstop litigation was scheduled just so Terminix could resolve its backlog of currently pending termite claims. *Id.* The scale of these litigation claims was concealed from investors. *Id.* Indeed, ServiceMaster ensured that its Terminix contracts included a clause requiring non-public arbitration of any disputes through the American Arbitration Association. *Id.*

Because ServiceMaster executives understood that a turnaround of its core Terminix business was essential, beginning in early 2018 Defendants furthered their scheme to conceal the

increasing termite litigation claims and damage to the Company's financial results from such claims. *Id.* ¶ 57. Accordingly, in April 2018, Defendants created a new Terminix region that included the eight branches most affected by the Formosan termites, including the Mobile, Alabama branch. *Id.* ¶ 58. This new region implemented special mitigating procedures aimed at dealing with the Formosan problem.  *Id.*  For example, beginning in 2018, Defendants suddenly raised the prices on Terminix's contract renewals. *Id.* ¶ 59. Jeff Curtis, Terminix's former Director of Operations for the Gulf Region and current National Director of Claims, testified in a June 19, 2020 deposition in connection with an arbitration that beginning in 2018 Terminix raised renewal premiums from approximately $100 to $300 to $1,500 a year–more than an 1000% increase. *Id.*[3] The contracts accompanying these price increases provided Terminix's customers with fewer benefits than their original contracts. *Id.* For example, the new contracts eliminated repair guarantees for the first ten months of the contract and narrowed the value of any claims. *Id.*

Contrary to Defendants' assurances that the Terminix transformation was improving growth and creating long term sustainable value by improving customer retention rates, according to CW1 and CW2, Defendants utilized these price increases in an effort to run its own customers off before the customers uncovered any Formosan damage and to cover the increasing litigation costs the Company was incurring. *Id.* ¶ 60. CW1 stated that contrary to public statements, Terminix

---

[3] The Amended Complaint alleges in a footnote that prior to and during the Class Period, Stevenson, who reported directly to Defendant Varty, was directly and intimately involved in the claims process and setting the new price changes. *Id.* ¶ 59 n.3. For example, CW2, who worked at ServiceMaster and Terminix between 2005 and 2019 in various positions relating to customer marketing and retention and attended Steering Committee or "STEERCO" meetings where Terminix's problems with the Formosan termite were routinely discussed, reported that Stevenson reviewed and signed off on all the marketing materials associated with the price changes. *Id.* Furthermore, during the Class Period, CW3, a former Terminix Brand sales manager working in Mobile, Alabama, reported that Stevenson had to approve every claim over $50,000. *Id.* As CW3 explained, nearly 100% of the claims for $50,000 or more were coming out of Mobile, Alabama. *Id.*

anticipated that their price gauging would lead more than 90% of at-risk customers to cancel their lifetime guarantee contracts. *Id.* Furthermore, as part of the scheme, Terminix also began changing, inter alia, the claims process and treatments. *Id.* ¶ 60 n.4. An attorney for the claimants stated in July 2020 that Terminix's treatment change was performed in Mobile "in the hope that they will stop termite damage before its victims discover the hidden damage that is already occurring inside walls, ceilings and floors. [So that] [i]f these customers later discover the damage, Terminix will try to use a limitation in its contract that says customers have to find living termites in the property for Terminix to be liable." *Id.*

Corroborating these reports, the Alabama Attorney General and ADAI investigation uncovered evidence revealing:

> When customers suffered damages as a result of Terminix's failure to provide paid-for services, the company simply passed on these costs to Alabama consumers, in some cases charging them exorbitantly high annual renewal rate increases of up to 1000 percent. Terminix's actions were intended to force consumers to cancel their lifetime protection contracts or to accept new Terminix contracts that provided less benefits than consumers' existing lifetime contracts.

*Id.* ¶ 61. The Attorney General found that in attempting to mitigate the Formosan litigation costs known internally at the company, "Terminix violated several provisions of the Alabama Deceptive Trade Practices Act, an Alabama law designed to protect consumers from deceptive, fraudulent, unconscionable, and illegal acts . . . ." *Id.*

Defendants' mitigating efforts, however, failed. *Id.* ¶ 62. Customers living in Formosan hot spots could not afford to lose their termite protection as many insurance companies required homeowners to have termite protection in these at-risk areas. *Id.* Thus, despite the substantial price increases, many Terminix customers renewed their plans and sought to requalify and be retreated. *Id.* As a result, Terminix's risk of liability to termite damage claims actually increased as the Attorney General of Alabama began an investigation into Terminix's dramatic price changes. *Id.*

In addition to instituting the above protocols to conceal the increasing claims and risk of future claims, Defendants routinely refused to pay, or sought to delay, damage claims and/or awards absent any legitimate basis, including by appealing any award over $1 million to delay payments, regardless of the merits of the appeals. *Id.* ¶ 63.  For instance, Defendants' Director of Termite Damages Claims testified in an arbitration hearing that upon advising a senior company executive that an Alabama home, which had never been adequately treated, must be demolished and replaced due to Formosan damage, the senior executive refused to pay the $250,000 rebuild cost. *Id.* ¶ 64. This refusal was in direct contravention to Terminix's contracts. *Id.* Instead, senior company executives simply offered the homeowners $72,000, conditioned on their silence about receiving the payment and agreement not to disparage Terminix. *Id.*

Terminix's actions backfired, however, when the claimants took the Company to arbitration and were awarded more than $2.5 million, which included punitive damages. *Id.* ¶ 65. During the Class Period, the arbitrator – like many subsequent arbitrators – found: (1) "Terminix knew it had not performed the initial inspection or treatment" of a customer's home; (2) Terminix "knew that annual inspections of the entire structure were not done;" (3) Terminix "knew that the location of the house was in a precarious area because of Formosan activity"; and that (4) "[w]hen fraud is the chosen direction of a company's 'service' to its trusting customers and it tries to limit its responsibility for the damage it causes, it is reprehensible." *Id.* (citing McLaurin v. Terminix, Arbitrator's Decision, at 10.)

Far from being an isolated decision, from 2018 to 2020, Terminix was routinely ordered to pay millions of dollars to its customers after being found liable in recurring private arbitrations, including, but not limited to:

• A $1.6 million award for failing to adequately protect an Alabama customer's home from Formosan termites in the decades leading up to the Class Period. Weatherby v. The Terminix International Co., L.P., et al., Arbitration Order.

• An approximately $2.1 million award to a Mobile homeowner for failing to provide: (1) an adequate initial treatment; (2) adequate ongoing treatment; and (3) adequate inspections or remedial measures for termite damage. Peebles v. The Terminix Int'l Co. L.P., et al., Arbitrator's Final Award.

• An approximately $3.8 million award to an Alabama homeowner because the evidence revealed a "systematic and repeated pattern" by Terminix of failing to satisfy its contractual obligations with regard to termite protection. Britt v. The Terminix Int'l Co., L.P., et al., Award of Arbitrator. *Id.* ¶ 66.

Defendants did not disclose the devastating and consistent findings from these arbitration proceedings and, because the proceedings were private, were able to conceal the extent of their liabilities from investors. *Id.* ¶ 67. In doing so, Defendants hid Terminix's "systematic and repeated pattern . . . of failing to comply with its contractual and regulatory duties," misleading investors about: (1) the true state of ServiceMaster's critical Terminix segment; (2) the "transformation" efforts and successes they touted were "bearing fruit"; (3) the Company's exposure in costly litigation resulting in determinations requiring it to honor its agreements to remediate customer properties impacted by the Formosan termite; and (4) the hefty damage awards to those customers for failing to do so. *Id.* ¶ 67.

Defendants Varty and DiLucente repeatedly highlighted the importance of Terminix's transformation to ServiceMaster's success. *Id.* ¶ 68. Indeed, Defendant Varty stated during the December 2018 Investor Day that the transformation was the driving force of the "sustainable

organic growth that we need." *Id.* Defendants were also vitally focused on the Formosan issue that was hindering the awaited turnaround of its core business. *Id.* ¶ 69. For example, CW1 confirmed that immediately prior to the Class Period, Defendant Varty participated in weekly STEERCO meetings, during which the topics of Formosan termite damage claims and the Company's mitigation efforts were routinely discussed. These all-day meetings were also attended by Stevenson; Mathew Loos, Vice President, Marketing and Sales Effectiveness at Terminix; and Mac McCallister, Terminix's General Counsel, all of whom reported directly to Varty. *Id.* CW2, who attended STEERCO meetings, also confirmed that the Formosan termite issues were routinely discussed at these in-depth meetings prior to and during the Class Period. *Id.* Finally, CW1 confirmed that leading up to the Class Period, Defendant Varty discussed the Formosan termite issues in Mobile, Alabama during his "leadership team" meetings. *Id.*

Beginning on October 22, 2019, the truth regarding the scope of the adverse impacts of the Formosan termite activity began to leak out to the market with the Company admitting that "termite damage claims arising primarily from Formosan termite activity" had "been increasing over the last few years." *Id.* ¶ 74. On November 5, 2019, Defendants expanded on these undisclosed adverse impacts, announcing that the quarter had been impacted by "legacy risks," including "termite damage claims." *Id.* Defendants' admissions on October 22, 2019 and November 5, 2019 further revealed what Defendants had been misrepresenting and concealing during the Class Period. *Id.* ¶ 75. For example, ServiceMaster admitted that the "damage claims arising primarily from Formosan termite activity" had grown so severe that since 2018 the Company had undertaken operational changes to "manage the impact of termite damage claims." *Id.* Defendant Varty later acknowledged that one of these mitigating procedures was a pricing initiative to drive its customers away and thereby reduce the Company's exposure to these costly

claims. *Id.* Defendant Varty further acknowledged that not only had the increase in termite litigation already impacted Terminix revenue by 7% to 8% but also that the increase in claims would continue to impact the Company throughout 2020. *Id.*

Analysts noted the admissions.  For example, an October 22, 2019 report from The Buckingham Research Group stated, "Termite claims are popping up seemingly out of the blue in Alabama . . . . We saw some lawsuits filed but we saw no evidence of any trouble in SERV's numbers until the preannouncement earlier this week. . . . Terminix is nowhere near as far along in its transformation progress as we thought." *Id.* ¶ 76.  On October 22, 2019, Morgan Stanley Research also reported that the new damage claims costs "were not anticipated" by investors. *Id.* In response to these revelations, ServiceMaster's share price fell precipitously, losing $20.44 per share between October 21 and November 6, 2019, a 36% drop. *Id.* ¶ 77.

Lead Plaintiff alleges that once the fraud came to light, Defendant Varty–"the face of the Terminix transformation"–abruptly resigned as ServiceMaster's CEO two months later. *Id.* ¶ 71. Analysts and the media noticed the alleged connection between the two events.  For example, on the day of Defendant Varty's resignation, a RBC Capital Markets report stated: "CEO exit is not good optics, in our view, given the outstanding legacy termite claims issue for the Terminix business that has been an overhang on the stock, which is down 34.5% since the company pre-announced 3Q results Oct 22 (S&P +10.7%) and disclosed higher-than-expected cost pressure . . . ." *Id.* ¶ 71. Stevenson, another face of the Terminix transformation, who reported directly to Defendant Varty during the Class Period, abruptly resigned as well when the alleged fraud began leaking out to the market. *Id.* ¶ 72.

The Amended Complaint alleges that Defendants were aware or reckless in not knowing that their positive statements during the Class Period regarding the purported success of

ServiceMaster's Terminix transformation, and operational and financial results and trends as a result of the "transformation" efforts, were misleading and/or lacked a reasonable basis. *Id.* ¶ 73. Furthermore, Defendants were aware or reckless in not knowing that their reported EBITDA was inflated as they materially understated the accrual associated with the actual claims that had been made by customers due to the Formosan scheme, and the risk of future claims related to it. *Id.*

From these and other premises, Lead Plaintiff and the class of investors it represents would hold Defendants liable for securities fraud.   Count I of the Amended Complaint alleges that Defendants, ServiceMaster and its senior executives, schemed to defraud and disseminate or approve false or misleading statements about the company's business, which they knew or recklessly disregarded were misleading. *Id.* ¶ 140.  By their conduct Defendants violated §10(b) of the 1934 Act and Rule 10b-5. *Id.* ¶ 141.  Specifically, Defendants "(a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ServiceMaster common stock during the Class Period." *Id.* Lead Plaintiff and the Class "paid artificially inflated prices for ServiceMaster common stock, and suffered losses when the relevant truth was revealed." *Id.* ¶ 142. Lead Plaintiff and the Class "would not have purchased ServiceMaster common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and scheme." *Id.*

Count II of the Amended Complaint alleges that the individual Defendants are liable pursuant to §20(a) of the 1934 Act.  Each individual Defendant acted as a control person of

ServiceMaster, as §20(a) of the 1934 Act defines the term. *Id*. ¶ 145. The individual Defendants held executive-level positions within ServiceMaster, had their own ownership and contractual rights, had inside knowledge of the company's actual position as well as the statements published through SEC filings. *Id*. As such, the individual Defendants "had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the operation of the scheme and the content and dissemination of the statements that Lead Plaintiff contends are false and misleading." *Id*. Their failure to intervene in the company issuing fraudulent statements violated the 1934 Act. *Id*.

### III. Defendants' Joint Motion to Dismiss the Amended Complaint

Defendants seek the dismissal of the Amended Complaint. First, Defendants argue that the Amended Complaint fails to state a §10(b) claim. Statements concerning the "transformation of Terminix" were couched as statements of belief, in other words, inactionable opinions. Likewise, any management statements about estimated EBITDA are "accounting judgments based on management opinion as opposed to objective facts." Defs.' Mem. in Support 11 (ECF No. 63-1). Defendants argue that comments about the probability of future costs being incurred and even whether such costs are subject to reasonable estimation are subjective accounting judgments tantamount to opinion. And the Amended Complaint nowhere alleges that Defendants offered their assertions but did not actually hold the opinions at the time they expressed them or that Defendants lacked a reasonable basis for the opinions. The allegations of falsity concerning the "transformation" are focused on developments Terminix's business in and around Mobile, Alabama, while leaving out ServiceMaster's overall improvement in customer service, client retention, and positive growth. In short, other evidence shows that there was reason to believe the "transformation" was working. The Amended Complaint relies largely on the unsourced reports

of confidential witnesses of the sort that courts in the Sixth Circuit would "steeply discount." *Id.* at 12.  The pleadings allege that two of the witnesses were local managers in the Mobile area, not company insiders preparing the company's public disclosures.  The Amended Complaint simply fails to allege the falsity of any statement.

The remainder of the statements listed by Lead Plaintiff are best understood as optimistic statements of opinion or puffery or protected statements about prospective developments. Defendants argue that many statements are forward-looking and therefore protected under the Private Securities Litigation Reform Act.  The Amended Complaint's direct quotes from the senior executives also include appropriate cautionary language.  Insofar as Lead Plaintiff alleges a failure-to-disclose claim based on the Formosan termite issues, the Amended Complaint fails to state such a claim.  The Amended Complaint does not plead any facts to show that the individual Defendants knew of an adverse trend in the Formosan claims at the time they made the challenged statements. And as a factual matter, the "trends" cited in the Amended Complaint speak of trends in termite activity, not trends in termite claims against Terminix.

Defendants further argue that the Amended Complaint fails to plead with particularity any facts to establish scienter.  Lead Plaintiff based its allegations largely on the uncorroborated reports of the confidential witnesses.  These witnesses, however, were not in a position to evaluate Terminix's broader exposure due to the Formosan termite claims or other internal accounting or reporting considerations.  But these witnesses are not alleged to have had contact with Varty or DiLucente or reported their concerns to senior executives.  Another confidential witness could only report that Varty attended meetings where Formosan termite issues were discussed, without offering more detailed allegations about the substance of the discussions during the meetings.  The only allegations going to scienter also fail.  The Amended Complaint references ServiceMaster's

internal reports on Formosan termite claims and how the internal analysis differed from public disclosures.  The Amended Complaint also alleges that Defendants disregarded other available information in making their public statements.  Lead Plaintiff has not alleged what specific documentary evidence was available to Defendants or that the information suggested ServiceMaster faced greater risk of losses than it otherwise disclosed.  The departure of ServiceMaster senior executives, including Varty himself, is not probative of scienter.  Finally, Defendants argue that in the absence of a plausible securities fraud claim, the Court should also dismiss Lead Plaintiff's control person claim.  Therefore, the Court should dismiss the Amended Complaint.

Lead Plaintiff has responded in opposition.  As an initial matter, Lead Plaintiff argues Defendants have not contested the Amended Complaint's "scheme" allegations.  By failing to raise these allegations in its opening brief, Defendants have waived the issue.  As for the merits of Defendants' arguments, Lead Plaintiff answers that the Amended Complaint has pleaded the elements of its securities fraud claims.  Defendants' argument that certain statements are merely puffery calls for a fact-bound assessment, inappropriate at the pleadings stage.  Defendants' statements are actionable in this case because were made "in the face of contradictory evidence." Pl.'s Resp. in Opp'n 8 (ECF No. 66).  Defendants' statements about a "transformation" were not just future oriented, if for no other reason than the statements ignored then-current obstacles faced by the company and omitted other key information.  And Defendants have cited only two statements made with "we believe" language consistent with opinions.  Many other statements cited in the Amended Complaint and read in their full context are clearly statements of fact.  The Amended Complaint alleges that Defendants made certain statements with no belief in their truthfulness or that the very least statements inconsistent with other facts then known to

Defendants.   Lead Plaintiffs also defends the weight and probative value of statements from confidential witnesses.   The statements from the confidential witnesses in this case clearly corroborate the inference of a fraudulent scheme, especially when viewed in light of the private arbitration awards against Terminix and the findings of Alabama state officials who investigated Terminix.  And Defendants' arguments to the contrary notwithstanding, the Amended Complaint does not rely on future-oriented statements. The test in this regard is not whether the statement speaks of future events but whether the statement can be verified at the time it was made. Defendants' statements, as alleged in the Amended Complaint, satisfy this standard.  Defendants' arguments about accounting judgments are likewise unavailing.  In this case Lead Plaintiff alleges that Defendant manipulated accounting by passing increased costs to customers, refusing to pay valid claims, and defensively appealing all arbitration awards in excess of $1 million.   These omissions left investors in the dark about Terminix's true state of affairs.

Lead Plaintiff next argues that Defendants' financial statements filed with the SEC were misleading.  The disclosures did not disclose the increase in Formosan claims that Defendant knew about or reasonably expected to have a material impact on revenues or income for purposes of Item 303 of SEC Regulation S-K. Varty acknowledged in November 2019 that the increase in Formosan termite claims had occurred over "the past few years."  Varty's comment shows that management knew of the trend and had a duty to disclose it before they did.  Taken with other allegations about efforts to mitigate the losses, the Amended Complaint plausibly alleges a securities violation.

Lead Plaintiff contends that the Amended Complaint plausibly alleges scienter. The temporal proximity between the allegedly misleading statements and the corrective disclosures suggests knowledge.  The Amended Complaint also alleges a divergence between internal reports

and public statements.   The alleged fraudulent statements pertained to ServiceMaster's core business.   The Amended Complaint alleges that Terminix represented approximately 87% of the ServiceMaster's revenues and nearly 80% of EBITDA.   Lead Plaintiff also alleges that key corporate executives abruptly left the company. In fact, Terminix's president, who had responsibility to approve termite damage claim payments over $50,000 and was involved in the alleged scheme, resigned the same day ServiceMaster disclosed the increase in Formosan termite claims.   Within two months, Varty resigned, and then within weeks of reaching a $60 million settlement with the Alabama Attorney General, DiLucente resigned. The State of Alabama's investigation also supports an inference of scienter.   Defendants SOX disclosures and personal motivation to paint a picture of Terminix turning a corner all further support the inference of scienter.

## **STANDARD OF REVIEW**

Defendants seek the dismissal of the Amended Complaint at the pleadings stage "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992). Legal conclusions or unwarranted factual inferences need not be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim." *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") "imposes two additional pleading requirements": the pleadings must "specify each statement alleged to have been misleading along with the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018) (quoting 15 U.S.C. § 78u-4(b)(1), (b)(2)).   The PSLRA goes further than Rule 8 and requires that the elements of securities fraud be pleaded with the heightened particularity required under Federal Rule of Civil Procedure 9(b).  Generally speaking, Rule 9(b) requires a plaintiff to allege the time, place, and content of any misrepresentation; the defendant's fraudulent intent; the fraudulent scheme; and the resulting injury.  *Power & Tele. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (citing *Coffey v. Foamex, L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)). In other words, the PSLRA and Rule 9(b) "require a complaint to allege the who, what, where, when, and

why of the fraudulent statements." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, ---

F.4th ---, No. 21-5602 (6th Cir. Mar. 31, 2022) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d

238, 245 (5th Cir. 2003)). "So, when examining allegedly fraudulent statements, we ask: Who said

the statement? What is the statement? Where did they say it? When did they say it? Why is it

misleading?" *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). If the complaint does not answer all of these

questions, it fails to sufficiently plead securities fraud. *Id.*

"Claims of fraud raise a high risk of abusive litigation." *U.S. ex rel. Marlar v. BWXT Y-12,*

*L.L.C.*, 525 F.3d 439, 445 (6th Cir. 2008) (citing *Twombly*, 550 U.S. at 569 n.14)). Rule 9(b)'s

heightened pleading standard exists "(1) to alert defendants to the particulars of the allegations

against them so they can intelligently respond; (2) to prevent 'fishing expeditions'; (3) to protect

defendants' reputations against fraud allegations; and (4) to whittle down potentially wide-ranging

discovery to only relevant matters." *Thompson v. Bank of America, N.A.*, 773 F.3d 741, 751 (6th

Cir. 2014) (citing *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466–67 (6th Cir. 2011)).

## <u>ANALYSIS</u>

"Section 10(b) of the Securities Exchange Act makes it unlawful for any person to 'use or

employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors.'"

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C. § 78j(b)). The

Securities and Exchange Commission has adopted Rule 10b–5, which prohibits a person from

"mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in

order to make the statements made, in the light of the circumstances under which they were made,

not misleading." 17 CFR § 240.10b–5(b).

Rule 10b-5 goes further than actual misrepresentations or omissions and also makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud," or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . . in connection with the purchase or sale of any security." *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1096 (2019) (quoting 17 C.F.R. § 240.10b–5)(a) & (c)). The Sixth Circuit has held that "Rules 10b–5(a) and (c) encompass conduct beyond disclosure violations" under Rule 10b-5. *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir. 2005) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152–53 (1972)).

The Amended Complaint alleges all three types of Rule 10b-5 violations as grounds to hold Defendants liable for securities fraud.  Lead Plaintiff alleges that "Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ServiceMaster common stock during the Class Period."  Am. Compl. ¶ 141.  This allegation tracks the language found in Rule 10b-5 itself and the paragraphs defining securities fraud under the Rule.

## I. Amended Complaint's "Scheme Liability" Claims

One of the issues presented at the pleadings stage is whether the Joint Motion to Dismiss argued for the dismissal of each of the Amended Complaint's Rule 10b-5 theories of liability or only for the dismissal of the actual misrepresentation/omission theory under Rule 10b-5(b).  Lead Plaintiff argues in its response brief that Defendants' opening brief moves only for the dismissal of the Amended Complaint's Rule 10b-5(b) securities fraud claim based on material

misrepresentations or omissions.   In Lead Plaintiff's view, the Joint Motion to Dismiss is completely silent on the Amended Complaint's theory of "scheme liability" under Rule 10b-5(a) and (c).  Pl.'s Resp. in Opp'n 4-5 (citing *e.g. Grae v. Corr. Corp. of America*, 2017 WL 6442145, at *12 (M.D. Tenn. Dec. 18, 2017)).[4]  Defendants argue in their reply brief that the Joint Motion argues for the dismissal of all three of Lead Plaintiffs' Rule 10b-5 theories of relief.

The Court tends to agree with Lead Plaintiff that Defendants' opening brief did not squarely argue for the dismissal of a "scheme liability" theory of securities fraud. "Scheme liability occurs when a defendant employs 'any device, scheme, or artifice to defraud,' 17 C.F.R. § 240.10b–5(a) (Rule 10b–5(a)), or 'any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,' 17 C.F.R. § 240.10b–5(c) (Rule 10b–5(c))." *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016); *see also Lorenzo*, 139 S. Ct. at 1101 (construing the dictionary definition of "scheme" for purposes of Rule 10b-5(a) as a "project, plan, or program of something to be done"). The Amended Complaint makes a number of allegations concerning the alleged "scheme" to conceal the extent of Terminix's legal exposure to damages claims from Formosan termite activity. In fact, Lead Plaintiff uses the word "scheme" to describe Defendants' conduct forty-six (46) times in the Amended Complaint.  Defendants' Rule 12(b)(6) arguments were aimed at the allegations of material misrepresentation and omission and scienter with specific reference to Rule 10b-5(b), and Defendants' memorandum briefly quoted some of the allegations mentioning a "scheme" but never referred to Rule 10b-5(a) or (c).

---

[4] Lead Plaintiff makes a related argument that as a matter of pleading, the Amended Complaint can allege numerous false statements "offered in service of a single, central theory of liability" and without specifically pleading the falsity on a "statement-by-statement" basis. Pl.'s Resp. in Opp'n at 5.

The Supreme Court and the SEC "have long recognized considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws." *Lorenzo*, 139 S. Ct. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) ("[I]t is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct" (internal quotation marks omitted)).  Even so, "[a] scheme liability claim is different and separate from a nondisclosure claim." *IBEW Local 595*, 660 F. App'x at 858 (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n. 29 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013)).

The case law on scheme liability under Rule 10b-5(a) and (c) underscores the distinction between liability under these paragraphs and under Rule 10b-5(b), precedent which Defendants' memorandum did not actually address.  The Sixth Circuit has not defined the elements of "scheme liability" under Rule 10b-5.  *See Benzon*, 420 F.3d at 611 ("However, there is very little case law explaining more specifically what types of claims are actionable under these provisions, which would assist the Court in determining whether Plaintiffs have properly stated a claim that Defendants violated 10b–5(a) and (c).").  Other Circuits, including "the two circuit courts that traditionally see the most securities cases, the Second and Ninth Circuits," have reached the issue. *Public Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) (citing Schanbaum, *Scheme Liability:  Rule 10b–5(a) and Secondary Actor Liability after Central Bank*, 26 Rev. Litig. 183, 197 (Winter 2007)).  The Second and the Ninth Circuits have concluded that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1057 (9th Cir. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d

161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)[.]"); *see also KV Pharm.*, 679 F.3d at 987 ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b).").

The Second Circuit has defined the pleading standards for scheme liability claims. "To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citing *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)). Rule 9(b) applies to scheme liability claims because the claims sound in fraud. *Id.* This means that for a scheme liability claim, a plaintiff must specify with particularity "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Id.* (citing *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005)). In *Plumber & Steamfitters Local 773*, the Second Circuit affirmed the dismissal of a scheme liability claim at the pleadings stage where the complaint failed to "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Id*.

Against this backdrop the Court cannot say that Defendants have argued for the dismissal of the Amended Complaint's scheme liability theory. Defendants nowhere mentioned scheme liability under Rule 10b-5(a) or (c) and did not cite or discuss of any the leading cases discussing the pleading standards for "scheme liability." The Court expresses no view on the merits of the question of whether Lead Plaintiff has alleged a plausible "scheme liability" claim. But the fact is

the question was not presented in the Joint Motion to Dismiss or in Defendant's opening memorandum. The Sixth Circuit has held that a district court errs in dismissing a Rule 10b-5(a) or (c) claim at the pleadings stage by addressing only a Rule 10b-5(b) claim and completely failing to address the "scheme liability" theory. *Benzon*, 420 F.3d at 611 ("We therefore conclude that the district court's determination that Defendants complied with their disclosure obligations [under Rule 10b-5(b)] does not dispose of Plaintiffs' claims under Rule 10b–5(a) and (c) . . . ."); *see also In re Alphabet, Inc. Securities Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) ("Because the district court erred in *sua sponte* dismissing Rhode Island's claims under Rule 10b-5(a) and (c) when Alphabet had not targeted those claims in its motion to dismiss, we reverse dismissal of the claims under Section 10(b) and Rule 10b-5(a) and (c) against all defendants and remand to the district court.") (other citations omitted). Because Defendants did not raise the "scheme liability" issue in their opening brief and the parties did not develop arguments about the claim, the Court declines to reach the issue as part of its determination of the Joint Motion to Dismiss.

## II. Material Misrepresentations and Omissions Under Rule 10b-5(b)

The Court now considers each of the arguments raised in the Joint Motion to Dismiss. Defendants first seek the dismissal of securities fraud claims for the violation of Rule 10b-5(b) based on alleged material misrepresentations and omissions by Defendants. The PSLRA defines the following elements of a securities fraud claim under § 10(b) of the 1934 Act and SEC Rule 10b–5: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig. (Omnicare III)*, 769 F.3d 455, 469–70 (6th Cir. 2014) (citing *Matrixx Initiatives*, 536 U.S. at 37–38 (internal quotation marks omitted)). Defendants argue at the

pleadings stage that the Amended Complaint fails to state the first two elements of Lead Plaintiff's Rule 10b-5(b) securities fraud claim: (1) material misrepresentation or omission and (2) scienter.

Before reaching the substance of the pleadings, the Court considers the parties' arguments about the correct analytical framework for examining the Rule 10b-5(b) allegations.  The parties disagree over whether the Court should make a statement-by-statement analysis of each of the remarks given by Defendants Varty and DiLucente and cited in the Amended Complaint as examples of misrepresentations or omissions during the Class Period, or, conversely, whether the Court should consider the remarks as part of a larger pattern of misrepresentations and omissions. The Joint Motion to Dismiss takes on each alleged misrepresentation quoted in the Amended Complaint and argues why each statement fails to make out a securities violation.  Defendants have prepared and attached to their Joint Motion a table summarizing each of the statements found in the Amended Complaint, the source of the statement (with references to supporting exhibits attached to the Amended Complaint), and Defendants' argument for the grounds to dismiss the statement.  *See* Jt. Mot. to Dismiss, ex. A, Chart of Alleged Misrepresentations and Bases for Dismissal (ECF No. 63-2).  Lead Plaintiff challenges Defendants' approach to attacking individual statements and argues instead that the Court should consider the statements as representative of a larger scheme of misleading statements and omissions.

The Court finds that Defendants have the better of this argument.  At the pleadings stage, the Court's inquiry necessarily focuses on the content and context of each alleged misrepresentation or omission as part of its determination of whether the pleadings state a plausible claim of securities fraud for purposes under the PSLRA and Rule 10b-5(b).  "The PSLRA mandates that, where plaintiffs allege that the defendant 'made an untrue statement of a material fact' or 'omitted to state a material fact necessary in order to make the statements made, in light

of the circumstances in which they were made, not misleading,' plaintiffs must '*specify each statement* alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.'" *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)(1) (emphasis added). In other words, a plaintiff has a pleading burden to point to specific statements or omissions and explain how each is misleading in order to state a plausible claim with the requisite particularity. Lead Plaintiff's argument speaks more, perhaps, to "scheme liability" under Rule 10b-5(a) or (c), an issue the Court declines to reach as part of its determination of the Joint Motion to Dismiss. Suffice it to say for now, the Court will examine each of the alleged misrepresentations or omissions and the circumstances surrounding the statements individually.

Defendants raise a series of arguments about the nature of the misrepresentations alleged in the Amended Complaint, all of which fail to plead the element of Plaintiffs' securities fraud claim. The Amended Complaint alleges that Defendants made three kinds of materially false and misleading statements or omissions about its Terminix division: (1) statements about management's execution of a "transformation" of the company (Am. Compl. ¶¶ 79-92); (2) statements about the company's legal exposure from termite damage claims (Am. Compl. ¶¶ 93-105); and statements in the company's SEC disclosures (Am. Compl. ¶¶ 106-114). "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Omnicare III*, 769 F.3d at 470 (citing *Matrixx Initiatives*, 536 U.S. at 37). For purposes of securities law, a misrepresentation is defined as "an affirmative statement that is misleading or false." *Id*. An

omission means a defendant's "failure to disclose information when it had a duty to do so," based either on "insider trading, a statute requiring disclosure, or . . . an inaccurate, incomplete, or misleading prior disclosure." *Id.* at 471 (citing *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).

## A.    The Terminix "Transformation"

The Amended Complaint essentially alleges that in promoting their plans to "transform" the company, Defendants misrepresented material information regarding the Formosan termite issues besetting their operations in Mobile, Alabama, and the company's plans to address the issues.  Lead Plaintiff alleges that Defendants made a number of material misrepresentations or omissions in public statements, mainly press releases or quarterly earnings calls with investors, concerning management's efforts to "transform" the company's Terminix division. Lead Plaintiff's allegations focus on statements made in connection with quarterly earnings reports for the fourth quarter of 2018 (February 26, 2019; Am. Compl. ¶¶ 80-81), the first quarter of 2019 (May 7, 2019; Am. Compl. ¶¶ 84-87), and the second quarter of 2019 (August 6, 2019; Am. Compl. ¶¶ 89-90).  The Amended Complaint alleges that each statement was "materially false and/or misleading or omitted material information necessary to make them not misleading," essentially because senior executives did not disclose the problems posed by Formosan termite claims in the Mobile, Alabama area.  Am. Compl. ¶ 92.  Each set of statements occurred at different times and under somewhat different circumstances.  Because the Court's task is to make an individualized determination of each statement in context, the Court will now examine each set of statements to decide whether the Amended Complaint states an actionable claim based on any of them.

### *(1) February 26, 2019 Statements Re: Q4 2018 Results*

In connection with releasing its financial results for the fourth quarter of 2018, ServiceMaster issued a press release, and senior executives, including Defendants participated in a conference call with investors on February 26, 2019.  In its press release, Varty was quoted as stating:

> "Our primary goal in 2018 was to transform our Terminix business and unlock the potential to drive sustainable revenue growth. We are pleased to report that our focused efforts throughout 2018 and strategic initiatives resulted in record revenue at Terminix in the fourth quarter and full year 2018 . . . . Improvements in pest sales, driven by enhanced marketing initiatives, and stronger start and completion rates drove organic growth of 5 percent during the quarter, including over 7 percent in residential pest for a second consecutive quarter." Am. Compl. ¶ 80.

During the conference call with investors, Varty offered a similar assessment:

> We made tremendous progress on the core business in 2018, while taking on an increased workload to deliver on the spin, which was a major commitment to our shareholders. Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high. With 5% organic growth in the quarter, we are approaching industry-level growth rates and have direct line of sight to 30% incremental margins. We are focused on improving profitability in the Terminix business, but we are approaching the next steps in a strategic, disciplined manner. We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer service levels and, ultimately, a declining growth rate. We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth, both organically and through acquisitions, to the bottom line. By focusing on our mission of creating cleaner, healthier, safer environments for our customers at home, work and play, we can deliver on our future commitments just as we have done in 2018, and I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value.

The Court holds that the Amended Complaint fails to state a Rule 10b-5(b) misrepresentation or omission claim based on these two statements regarding the company's "transformation."  First, Lead Plaintiff does not contest any of the empirical facts contained in the statements, facts that the Sixth Circuit has described as "hard information." "Hard information" is "typically historical information or other factual information that is objectively verifiable."

*Omnicare III*, 769 F.3d at 470. (citations omitted). To state a securities fraud claim based on a misrepresentation of hard information, the plaintiff must "plead[] facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* (citing *Murphy v. Sofamor Danek Grp., Inc.* (*In re Sofamor Danek Grp., Inc.*), 123 F.3d 394, 401 (6th Cir. 1997)) (other citation omitted). At the pleadings stage, this means the plaintiff must "specify each statement alleged to have been misleading along with the reason or reasons why the statement is misleading." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018).

The Amended Complaint fails to allege how any of the hard information, for example, the company's calculated growth rate for the quarter or the growth reported for Q4 2018 relative to the company's growth in recent quarters, was misleading or the reasons why it was misleading. "The disclosure of accurate historical data does not become misleading even if . . . [the corporation might predict] less favorable results . . . in the future." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re Sofamor Danek Grp.*, 123 F.3d at 401 n.3). Without some allegation to show why the hard information in the February 2019 statements was factually inaccurate, the Amended Complaint has failed to allege how they are misrepresentations of fact.

The bulk of the February 2019 statements quoted in the Amended Complaint are more properly understood as "soft information," i.e., "predictions and matters of opinion." *Omnicare III*, 769 F.3d at 470. For a misrepresentation claim based on "soft information," a plaintiff must "plead facts showing that the statement was made with knowledge of its falsity." *Id.* (citing *Indiana St. Distr. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* (*Omnicare I* ), 583 F.3d 935, 945–46 (6th Cir. 2009)). The Sixth Circuit has clarified that in assessing a statement of soft information, the "subjective aspect of the falsity requirement and the

scienter requirement essentially merge." *Id*. Assessing the speaker's knowledge of the falsity of his statement actually goes to the separate element of scienter. *Id*. (citing *Brown v. Credit Suisse First Bos. LLC* (*In re Credit Suisse First Bos. Corp. Sec. Litig.*), 431 F.3d 36, 48 (1st Cir. 2005)).

In addition to deciding whether a statement is objectively false or misleading, courts must also consider whether the statement is material.  A misrepresentation or an omission is material if there is a substantial likelihood that "a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *In re Ford Motor Co.*, 381 F.3d at 570 (quoting *In re Sofamor*, 123 F.3d at 400).  On the other hand, "vague, soft, puffing statements or obvious hyperbole" are generally immaterial because "a reasonable investor would not rely" on such statements. *Omnicare III*, 769 F.3d at 472 (citing *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (other citation omitted). Statements that are "mere puffing" or "corporate optimism" may be forward-looking or "generalized statements of optimism that are not capable of objective verification." *In re Ford Motor Co.*, 381 F.3d at 570 (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). The Sixth Circuit has held that courts may dismiss a complaint "on the ground that the alleged misrepresentations or omissions are immaterial only if 'they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Id.* (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001) (en banc)).

The February 2019 statements quoted in the Amended Complaint are precisely this kind of soft information.  Varty remarked on the company's Q4 2018 results in the press release on February 26, 2019, that the company had as its "primary goal in 2018 . . . to transform our Terminix business and unlock the potential to drive sustainable revenue growth."  Am. Compl. ¶ 80. Vary later boasted on the February 26, 2019 conference call of "tremendous progress on the core

business in 2018," "improving profitability" and "taking the necessary steps to create a long-term sustainable business model that will convert consistent growth."  Varty summarized his glowing assessment of the company's 2018 performance and its prospects for 2019 this way: "I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value." *Id*.  ¶  81.[5]  These  statements  are  classic  examples  of  the  kind  of "vague, soft, puffing statements or obvious hyperbole" upon which a reasonable investor would not rely.  *In re K–tel*, 300 F.3d at 897.  In the final analysis, Varty's February 2019 comments grade out as future-oriented and "generalized statements of optimism that are not capable of objective verification."  The Court concludes then that the statements lack materiality and therefore cannot form the basis of a plausible disclosure claim under Rule 10b-5(b).

The Amended Complaint's allegations in paragraph 92 do not alter this conclusion.  After alleging the contents of each of the quarterly reports and conference calls during the Class Period, Lead Plaintiff alleges that Defendants' statements about "transforming the company" were "materially false and/or misleading or omitted material information necessary to make them not misleading."  Am. Compl. ¶ 92.  The Amended Complaint provides the following facts to support this allegation:

> (a) The transformation was not being successfully executed in Formosan hot spots, such as Mobile, Alabama, where Defendants' scheme prioritized short-term cost-cutting over customer service initiatives that would drive long-term growth. For example, Terminix routinely failed to provide: (i) an effective initial treatment for Formosan termites; (ii) an effective ongoing treatment for Formosan termites; or (iii) an adequate remediation of Formosan termite infestations suffered by its

---

[5] Defendants argue that statements qualified with language such as "we think," or in this case "I am confident," suggest opinions and therefore are not actionable as Rule 10b-5(b) misrepresentations.  This is not a correct statement of the law. The Supreme Court has described the phrases "we believe" or "we think" as "magic words [that] can preface nearly any conclusion" and yet "remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 192–93 (2015). The use of these qualifying phrases does not automatically insulate the statement that follows from federal securities laws.

customers in Formosan hot spots, and particularly in the Mobile, Alabama region. See supra at ¶¶53-55. Further, as damages mounted in part because of Terminix's inadequate treatment, Defendants chose to undertake measures to drive away its customers before they could discover an infestation the Company was contractually obligated to remediate, provide its customers with fewer benefits than those to which were entitled, and force its customers to offset the rising litigation costs through raising the cost to renew their contract by as much as 1000% or be left with no protection should their property become infested with termites. *See supra* at ¶¶58-61, 69.

(b) Far from increasing revenue and growth through its focus on customer service, ServiceMaster incurred, and expected to incur, tens of millions of dollars in additional costs related to Formosan termite damage and the payment of customer claims arising from such damage. *See supra* at ¶¶56, 62-66, 69.

(c) Defendants' scheme to drive off its customers and cover the costs of damage claims in Formosan hot spots, such as Mobile, drove price increases, not the vague "market conditions" Defendants claimed in their statements to the market on May 7, 2019 described in ¶86. *See supra* at ¶¶58-62, 69.

(d) Defendants' scheme was intended to decrease customer retention, not to increase retention as Defendants represented in their statements to the market on May 7 and August 6, 2019 described in ¶¶84 and 89. For example, according to [confidential witness 1] the dramatic price increases implemented in the beginning of 2018 were intended to compel more than 90% of its customers to cancel their contracts and cover the costs of damages. As the Alabama Attorney General's Office and ADAI concluded upon finding that Terminix violated the Alabama Deceptive Trade Practices Act, Terminix's price increases prior to and during the Class Period were intended to force customers to "cancel their lifetime protection contracts." *See supra* at ¶¶58-62, 69.

The Court holds that these allegations, even accepted as true, have little or no bearing on the statements Defendants made in February 2019. The Amended Complaint refers to growing liabilities the company incurred in connection with Formosan termite claims in Alabama but without any temporal reference point to show that Defendants knew about the liabilities in early 2019. There is nothing in the Amended Complaint to show that Defendants had reason to know as of Q4 2018, the reporting period to which their February 2019 statements were directed, that the liabilities then existed or even whether they were merely potential liabilities. Other allegations about the Formosan termite claims are likewise silent about the timing of the claims and do nothing

to show what Defendants knew about the company's legal exposure and when they knew it. The other allegations, which the Court accepts as true at this stage of the proceedings, vaguely refer to claims originating in 2017 or 2018. By and large, however, they really just show that the claims began to grow over the course of 2019 and 2020, which obviously goes beyond the outer limit of the Class Period defined in the Amended Complaint.

At best then, any costs of which Defendants may have been aware in February 2019 were future costs. Future costs do "not need to be disclosed in prior financial statements since no asset had been diminished nor had a liability been incurred at the date of the financial statements." *In re Ford Motor*, 381 F.3d at 572. None of the allegations in paragraph 92 specifically allege how Defendants knew about the company's exposure in Alabama in late 2018 or early 2019 when they delivered their statements and comments in February 2019. To the extent paragraph 92 makes allegations about what Defendants knew at later times, the Court will return to the allegations as part of its analysis of the other statements Defendants made later in the Class Period.

### *(2) 2018 Form 10-K*

Following the publication of its Q4 2018 quarterly results in February 2019, ServiceMaster filed its Form 10-K with the SEC on March 1, 2019. As part of its filing, the company included the following statement:

> Approximately 80 percent of Terminix revenue comes from customers who enter into contracts with the option to renew annually. Typically, termite services require an initial inspection and the installation of a protective liquid barrier or bait stations surrounding the home. The protection plan contracts provide a guarantee for the repair of new damage resulting from termite infestation. After the first year, a customer has the option to renew the contract at a significantly reduced cost that extends the guarantee. Consequently, revenue generated from a renewal customer is less then [sic] revenue generated from a first-year termite customer.
>
> We believe that the strength of the Terminix brand, along with our history of providing a high level of consistent service, allows us to enjoy a competitive advantage in attracting, retaining and growing our customer base. We believe our

investments in systems and processes, such as routing and scheduling optimization, robust reporting capabilities and mobile customer management solutions, enable us to deliver a higher level of customer service when compared to smaller regional and local competitors. Our focus on attracting and retaining customers begins with our associates in the field, who interact with our customers every day. Our associates bring a strong level of passion and commitment to the Terminix brand, as evidenced by the 9-year and 8-year average tenure of our branch managers and technicians, respectively. Our field organization is supported by dedicated customer service and customer care center personnel. Our culture of continuous improvement drives an intense focus on the quality of the services delivered, which we believe produces high levels of customer satisfaction and, ultimately, customer retention and referrals.

Lead Plaintiff alleges that the Rule 10-K "highlighted the importance of Terminix customer renewals and explained that the Company's long-term termite service plan was key to its competitive advantage." Am. Compl. ¶ 83. However, Lead Plaintiff has not shown how any of the statements quoted are false or misleading. The statements in the Rule 10-K appear to be either verifiable fact claims or more business puffing about what corporate leaders "believed" the company's strengths to be: "a higher level of customer service," "focus on attracting and retaining customers," its employees' "strong level of passion and commitment to the Terminix brand," a corporate "culture of continuous improvement," and "an intense focus on the quality of the services delivered." *Id.* These statements are more of the "vague, soft" puffery found in the February 2019 press release and conference call. *Omnicare III*, 769 F.3d at 472. For the same reasons the Amended Complaint failed to state an actionable disclosure claim as to the February 2019 public statements, the Court holds that the Amended Complaint fails to state a Rule 10b-5(b) claim based on the contents of the March 2019 Rule 10-K.

### (3) May 7, 2019 Statements Re: Q1 2019 Results

The Amended Complaint next alleges that ServiceMaster issued a press release and made senior executives available for a conference call on May 7, 2019, to report on financial results for

the first quarter of 2019 ("Q1 2019").  The press release contained the following statement praising ServiceMaster's results:

> "Our solid performance in the quarter reflects the consistent progress we are making on executing our strategic initiatives," said ServiceMaster Chief Executive Officer Nik Varty. "In our pest control core, organic growth of 3 percent in the quarter included 4 percent growth in residential pest and 2 percent in termite and home services, despite the impact of unseasonably cold weather and flooding on our operations and lead flow. We see positive trends in commercial pest with customer retention reaching three-year highs, driven by continued improvement in customer service as we leverage the best practices of Copesan and enhance the customer experience we deliver. ServiceMaster Brands grew revenue organically 5 percent in the first quarter. Our focus on high-growth market verticals is paying dividends with healthcare cleaning and disinfection up 7 percent and commercial restoration up 35 percent in the quarter. Strategic M&A also continues to be a growth driver, with 11 pest control acquisitions in the quarter."

Am. Compl. ¶ 85. In a conference call with investors and analysts later the same day, Varty discussed the company's financial results and reiterated his conclusion that the company was focusing on its "enhanced customer service initiatives, which were key to ServiceMaster's transformation plan." *Id*. ¶ 86.

> Underlying all of these initiatives is reimagining the customer experience. Excellent customer service, easy to talk about but incredibly difficult to consistently deliver. My job as a leader of ServiceMaster is to empower our customer-facing employees with the training, tools and motivation needed to deliver consistently excellent customer service at every touch point. We are creating a culture obsessed with service delivery. And while that mindset will take time to permeate throughout our organization, we are already making great strides.

> *Id*.

As part of the Q&A portion of the call, a question was posed about what drove Terminix's price increases.  *Id.* ¶ 86.  Defendant DiLucente responded that Terminix's higher prices reflected "favorable market conditions." *Id.* The following exchange occurred:

> [Analyst:] Tony, in your prepared remarks, I heard you mention termite pricing a couple of times being better. That's consistent with some of the survey work that we've done recently on the pest control market. Can you just talk about what's driving the better pricing? Is that just Terminix kind of going out and getting

what it feels it deserves, where it's been lacking? Or do you feel just like the market is supportive of better pricing? Could you just sort of frame what's driving the better pricing? Because that's something that we're definitely seeing in our survey work.

[DiLucente:] Sure. Thanks, Seth. And I think the latter explanation you gave is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – we bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily. So [a] pretty typical thing for us.

*Id.*  In response to a question about whether he was seeing any "new business trends" in "termite control," and if so, "how [they] [were] performing," Defendant Varty stated that ServiceMaster's "renewed efforts" were "starting to pay dividends," which was a

"positive sign for [the Company's] termite business," stating in part: I mean what we're seeing right now is based on our new – renewed efforts to focus heavier on preventive rather than just curative is starting to pay dividends. It's just an initial rollout of our bundled offerings. So this will take some time to take traction, but already our customers are appreciating in our pilot programs sort of what's happening. I'm also even more excited for the future where we're driving these clean sheet designs, and termite was the first program we picked up on where we're completely redefining, how we do business with our customers and completely reimagining the journey and touchpoints that we have. So I see a lot of good – and all of this new stuff that we're going to drive is only going to work if our service levels start creeping up. And seeing the NPS score month after month after month improving and also finally starting to see the cancellations turnaround is a very positive sign for our termite business.

*Id.* ¶ 87.

The Court holds that the Amended Complaint fails to allege an actionable Rule 10b-5(b) claim as to the vast majority of the statements related to ServiceMaster's Q1 2019 earnings.  The May 7, 2019 press release addressed a number of facts from the earnings report, most of which were "hard information" concerning rates of growth, only one of which pertained to termite business ("2 percent in termite home services").  Lead Plaintiff has made no allegations to contest the truthfulness of any of the historical data described in the press release.  Many of the other

comments attributed to Varty in the press release continue to amount to nothing more than "vague, soft, puffing statements or obvious hyperbole," for example, "solid performance," "consistent progress," "positive trends in commercial pest," "continued improvement in customer service," and "focus on high-growth market verticals."  The Amended Complaint fails to state a Rule 10b-5(b) claim based on the content Defendants' May 7, 2019 press release.

The May 7, 2019 conference call was largely in the same vein.  Varty offered some of the same corporate-speak: "reimagining the customer experience," "[e]xcellent customer service," "empower[ing] our customer-facing employees," "deliver[ing] consistently excellent customer service at every touch point," "creating a culture obsessed with service delivery," and developing a "mindset . . . to permeate throughout our organization."  But Varty also responded to a question about trends in the termite business.  His response echoes some of the same vague sentiments and opinions about the "transformation" like Terminix's "renewed efforts to focus heavier on preventive rather than just curative."  Varty opined that the efforts were "starting to pay dividends." Varty's comments included cautionary or qualifying language about "an initial rollout of our bundled offerings" or "pilot programs," which would require "some time to take traction."  In his most future-oriented comments, Varty openly stated he was "even more excited for the future" and the company's effort to "completely reimagin[e]" "how we do business with our customers."

The Court construes the comments to be vague expressions of how the transformation was going and therefore not the kind of statements on which a reasonable investor might rely.  Varty also commented on his outlook about forward-looking prospects in the termite sector of the company's business, remarks with a decidedly future orientation.  The PSLRA "contains a limited safe harbor for forward-looking statements." *Dougherty*, 905 F.3d at 982.  "[I]n a securities-fraud case, a defendant will not be liable for a material forward-looking statement if either (1) the

statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, or (2) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." *Id*. at 983 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)). The PSLRA defines a "forward-looking statement" as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and "any statement of the assumptions underlying or relating to" such a statement. § 78u-5(i)(1)(B), (D). The safe harbor does not protect "a statement of present or historical fact." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 678 (6th Cir. 2003). Varty's comments about trends and the company's ongoing efforts to "transform" Terminix fall within the ambit of the PSLRA's safe harbor.

This just leaves comments DiLucente made about market-based price increases during the May 7, 2019 conference call. DiLucente was asked about "better" termite service pricing and what might be "driving it" to which he answered that the market could support "modest" periodic increases of this kind. The Amended Complaint alleges that "Defendants' scheme to drive off its customers and cover the costs of damage claims in Formosan hot spots, such as Mobile, drove price increases, not the vague 'market conditions' Defendants claimed in their statements to the market on May 7, 2019 . . . ." Am. Compl. ¶ 86. Defendants argue that the comment is not actionable as a misrepresentation because it states DiLucente's opinion about market-based pricing.

The Court finds that DiLucente's comment presents a close call for two reasons. The Court does not agree with Defendants that the comment represents only DiLucente's opinion. The

question and answer are asking for his explanation for the "better" pricing Terminix was able to get for its services, the analyst even going as far as suggesting the answer in the prologue to the question. DiLucente was asked not just for an opinion about the price phenomenon but an opinion tethered to the facts then known to him as CFO. The Supreme Court in *Omnicare* explained that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 188 (2015). And "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189.

Applying the Supreme Court's reasoning in *Omnicare* here, the Amended Complaint plausibly alleges that DiLucente's answer could have been misleading to a reasonable investor. The Amended Complaint alleges that when DiLucente offered his statement in May 2019, he likely had additional information about the reasons for the price increases Terminix was passing on to its customers. The Court would highlight once more that nothing in the Amended Complaint gives specific temporal context for the accruing Formosan termite claims or directly ties them to the quarter on which DiLucente was commenting. DiLucente's answer was not specific to any one region or even Terminix's residential termite service versus its commercial business. He simply offered a somewhat vague and fairly generic explanation for why Terminix could raise its prices. But the Amended Complaint specifically identifies this comment as part of Defendants' alleged "scheme" and explains why DiLucente's response furthered the scheme to conceal the full extent of Terminix's negative exposure to Formosan termite claims.

Nevertheless, for the reasons the Court has already explained, Defendants have not argued for the dismissal of the scheme liability claim under Rule 10b-5(a) and (c).  The Court express no view on how DiLucente's comments might be construed as part of a larger scheme.  At the pleadings stage, the Court holds that the Amended Complaint has alleged enough factual material to show that DiLucente's comment could be misleading when considered in light of other information then known to DiLucente.  The Court will analyze whether the Amended Complaint has alleged a strong inference of scienter as to this comment below.

### (4)  August 6, 2019 Statements Re: Q2 2019 Results

The Amended Complaint makes allegations about one final set of statements made by Defendants, this time in connection with the August 6, 2019, press release and conference call discussing financial results for the second quarter of 2019 ("Q2 2019").  The press release contained the following statement assessing ServiceMaster's results:

> Our relentless efforts on improving customer service and focus on employee performance capabilities enabled us to deliver strong organic revenue growth at Terminix, including the best organic growth we have seen in more than three years in our commercial pest service line. Improvements in customer retention and price realization drove growth across revenue channels, which more than offset the impact of unseasonable weather conditions.

Am. Compl. ¶ 89.  At the subsequent conference call, Varty remarked that

> Our focus on customer service is continuing to strengthen our core, and Slide 6 provides an example of progress we are making across our businesses. Residential. Starting in Terminix Residential, our focus on the fundamentals is resulting in a measurable, better customer experience built on significant improvements in the basic blocking and tackling of our route-based business. For example, missed appointments were down over 50% in the quarter versus [the] prior year. We are also making progress against our goal of speaking with customers before and after every service visit, allowing us to clearly explain the value of our services and set expectations for upcoming visits. We are also making meaningful improvement in the most important aspect of our business, our safety culture, with preventable accidents and injuries down 15% in the quarter. Returning our teammates home safely is our top priority every day. We have been able to make these strides while

also improving labor productivity by $2 million year-over-year to enhance overtime management and a targeted initiative to move many hourly technicians to a production-based pay plan. These initiatives helped drive a 4% reduction in Q2 year-over-year cancel rates in termite and residential pest control. We're also encouraged to see external confirmation of improving customer satisfaction through positive independent survey results over the last few months, one of which recently reported 91% customer satisfaction rate for Terminix, highest in the industry. While that kind of feedback is gratifying, we're not letting up. We know there is still considerable work ahead of us as we challenge ourselves against strong prior year growth numbers in the back half of this year.

*Id.* ¶ 90.

The Court holds that Varty's August 6, 2019 comments fail to state a plausible misrepresentation claim.  As the Court has noted in its discussion of other earnings-related statements, a good deal of the comments on this occasion are the kind of vague puffery that just does not meet the materiality test.  In fact, the great majority of the comments say almost nothing about Terminix's termite business.  The only remark that did reference the termite segment was a reduction in second quarter cancellation rates.  The Amended Complaint fails to allege how Varty's hard information about improving customer cancellations supports Lead Plaintiff's theory that Defendants were intentionally driving customers away.  Just as with other earnings-related statements cited in the pleadings, Lead Plaintiff has not shown how Varty's statements are false or misleading, particularly in context as he was speaking to takeaways from the second quarter of 2019.  Nothing in the Amended Complaint ties its allegations about Terminix's practices in the Mobile, Alabama area with the verifiable facts presented in the earnings commentary.  The Court concludes that the Amended Complaint fails to state a misrepresentation claim under Rule 10b-5(b) based on Varty's August 6, 2019 statements about Q2 2019.

**B.      Legal Exposure from Formosan Termite Claims**

The Amended Complaint next alleges that Defendants took steps to understate the accrual associated with termite damage claims, which resulted in reporting inflated EBITDA.  According to Lead Plaintiff, Defendants concealed the actual claims that had been made by customers due to the Formosan scheme and also the risk of future claims related to it. The Amended Complaint alleges that Defendants made these misrepresentations during the Class Period in some of the same earnings reports, conference calls, and SEC filings already analyzed by the Court.  The Amended Complaint alleges that each statement was "materially false and/or misleading or omitted material information necessary to make them not misleading," because Terminix had already incurred millions in liabilities and stood to incur millions more from Formosan termite claims in the Mobile, Alabama area.  Am. Compl. ¶ 105.  Just as the Court made an individualized determination of each of the ServiceMaster "transformation" statements in its context, the Court will now examine each statement related to Terminix termite liabilities to decide whether the Amended Complaint states an actionable claim based on any of them.

The Amended Complaint makes the following allegations related to the company's accruals for termite claims.   On February 26, 2019, ServiceMaster reported its financial results for Q4 2018.  Am. Compl. ¶ 94. As part of its release, the company provided 2019 adjusted EBITDA guidance of $435 to $445 million. *Id*. During a conference call with investors the same day, Defendant DiLucente stated that among the "other cost drivers in the quarter" was a "$2 million . . . damage claims expense increase, predominantly related to activity in a section of the Gulf Coast." *Id*.  Subsequently, during its August 6, 2019 conference call, DiLucente discussed Terminix's incremental margins and reported a figure of 5%, notwithstanding an increase in termite damage claims in the Gulf Coast.  *Id.* ¶ 100. DiLucente commented, "There was $2 million in increased damage claims expense primarily due to activity in the Gulf Coast region. We also

had $4 million in dis-synergies in the quarter. Excluding the impact of $6 million of dis-synergies and SalesForce's investments in the quarter, the incremental margins for Terminix were approximately 5%." *Id.* ¶ 100. DiLucente added that the company had "increased the bottom end of [its] free cash flow guidance and now expect[ed] to convert adjusted EBITDA to free cash between 55% and 60%." *Id.* ¶ 101. DiLucente went onto comment that he expected Terminix to drive more margin improvement in the second half of 2019. *Id.* ¶ 102 ("Yes. We definitely have more margin improvement in the second half of the year in Terminix. . . . Terminix is definitely the driver. And we have really consistently said that all along . . . we were going to see lower incremental margins in the first 2 quarters and we're going to slow–trend up particularly in the third and fourth quarter. So that's the main driver for that trend in the second half.").

In addition to these statements, the Amended Complaint also alleges that ServiceMaster filed its quarterly report on Form 10-Q with the SEC for each of the quarters during the Class Period. Each report states that "[t]he preparation of the consolidated financial statements requires management to make certain estimates and assumptions required under GAAP which may differ from actual results." *Id.* ¶ 96. The reports then identified "the more significant areas requiring the use of management estimates" including "accruals for termite damage claims." *Id.* The company reported that in 2018, "there were no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates . . . ." *Id.* With respect to termite damage claim accruals, the reports stated as follows:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

*Id*. ¶ 97.  The Amended Complaint alleges that each of ServiceMaster's Form 10-Q's during the

Class Period contained the same disclosures about termite damage accruals.  *Id*. ¶¶ 99, 103.

From these allegations, the Amended Complaint alleges that Defendants' statements were

false, misleading, and omitted other materials facts in light of the following:

> (a) ServiceMaster's operations and financial results had been and were expected to
> continue to be materially adversely impacted by extraordinary Formosan termite
> damage claims in Formosan hot spots, such as Mobile, Alabama, that was
> exacerbated by Terminix's wrongful course of business. *See supra* at ¶¶53-56, 58-
> 66, 69.

> (b) Defendants refused to pay its customers' damages claims in whole or in part in
> Formosan hot spots, such as Mobile, Alabama, absent any legitimate basis. *See
> supra* at ¶¶63-64. For example, Defendants' Director of Termite Damages Claims
> testified in an arbitration hearing that upon advising a senior Company executive
> that an Alabama home was never treated and must be demolished and replaced due
> to Formosan damage, the senior executive refused without any legitimate excuse.
> *See supra* at ¶ 64.

> (c) The Company's refusal to pay its customers' damages, caused in part by the
> failure to provide inadequate treatment, only increased Defendants' liability. For
> example, with regard to the home described in subsection (b), the rebuild that
> Defendants' refused to honor would have only cost $250,000. After the claimants
> took the Company to arbitration during the Class Period, the arbitrator awarded the
> homeowners and their attorneys approximately $2.8 million, including punitive
> damages. *See supra* at ¶65.

> (d) The Company had and continued to incur tens of millions of dollars in additional
> costs related to Formosan termite damage and the payment of customer claims
> arising from such damage. *See supra* at ¶¶56, 62-66, 69. Leading up to and
> throughout the Class Period, Terminix was routinely ordered to pay millions of
> dollars to its customers in private arbitrations for the Company's "systematic and
> repeated pattern" of failing to fulfill its contractual obligations to its customers,
> which one arbitrator called "reprehensible," the extent of which was concealed
> from investors. *See supra* at ¶¶65-66.

> (e) Defendants' scheme delayed the payments of awards, and the recognition of
> such losses, absent any legitimate basis. *See supra* at ¶¶63-64. For example, shortly
> before the Class Period, the Company resolved to appeal any award over $1 million
> to delay payments, regardless of the merits of the appeal.

> (f) Defendants' scheme to drastically increase annual renewal rates, concealed the
> expected damage claims and exposed the Company to greater liability. *See supra*

at ¶¶53-56, 58- 66, 69. For example, the Alabama Attorney General and ADAI concluded that the price increases were intended in part to pass on expected damages costs to its customers. *See supra* at ¶61. In addition, as a result of the unconscionable price increases, the Alabama Attorney General and ADAI began an investigation into Terminix, which resulted in Terminix being forced to enter into a $60 million settlement. *See supra* at ¶55.

(g) As a result, Defendants materially understated the accrual associated with damages claims throughout the Class Period and artificially inflated the Company's reported EBITDA.

*Id.* ¶ 105.

The Court holds that these allegations plausibly allege that Defendants' disclosures about ServiceMaster's termite damage claim accruals contained misleading statements. The Amended Complaint alleges a narrative of facts about the Formosan termite problems affecting Terminix customers in Alabama, particularly how Terminix had failed to protect covered property from termite infestation and how management's response to the situation only made it worse. The Amended Complaint alleges that Terminix had a "systematic failure to adequately treat homes and businesses in at-risk areas for these super termites." Am. Compl. ¶ 52. Terminix employees "routinely" fail to perform initial inspections, failed to apply adequate treatment, and failed to conduct follow-up inspections or retreatments in Formosan hotspots. *Id.*

Lead Plaintiff cites additional proof from a confidential witness ("CW1") who worked at Terminix between 2017 and 2019, analyzing sales trends and setting pricing in order to maximize Terminix's profitability. *Id.* ¶ 53 n.1. As part of his job responsibilities, CW1 analyzed customer claims for Formosan termite damage. *Id.* CW1 observed that Terminix's field employees were not incentivized to do proper initial inspections and thus did a poor job of inspecting its customers' homes and businesses. *Id.* ¶ 53. CW1's testimony is corroborated by the testimony of another former Terminix employee, CW4, who worked as branch manager for Terminix in Mobile, Alabama between 2009 to 2018. According to CW4, Terminix regularly undertreated properties

in Mobile, Alabama, for example by using a fraction of the pesticide required to provide adequate termite protection.  *Id.*

Not only was Terminix's service inadequate for the task, Terminix's response to the problem was to raise customer's renewal rates dramatically and hope that they chose not to renew their termite protection, all in an effort to escape liability for the poor service Terminix had provided.  The result was that by 2017 Terminix faced waves of termite litigation and arbitration, mainly related to Formosan termite activity in Mobile, Alabama. *Id.* ¶ 56.  And yet it was only in October 2019 that Defendants finally disclosed that termite damage claims had been increasing "over the last few years." *Id*. ¶ 74. The Amended Complaint alleges that Terminix incurred tens of millions of dollars in arbitration judgments and eventually reached a settlement with the State of Alabama over its business practices, though that only happened after the Class Period.[6]

Read against this factual backdrop, the gravamen of Lead Plaintiff's misrepresentation claim is that Defendants should have known that increased accruals were required to account for the growing liabilities Terminix faced in Alabama and that Defendant failed to adjust. The problem is not that Defendants' Rule 10-Q's during the Class Period failed to warn of the possibility of increasing legal obligations.  ServiceMaster disclosed with respect to termite damage claims that the company had "certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings" and that it "accrue[d] for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated."  What Defendants failed to report was the

---

[6] The Court continues to note that the Amended Complaint raises questions about the timeline of events in this case.  More specifically, Lead Plaintiff has not consistently tied its allegations to a specific timeframe to show when the conduct alleged actually occurred. Even with the benefit of the Alabama AG's report to substantiate some of the allegations, there is not always much temporal context.  That is a matter for summary judgment and not necessarily grounds to dismiss Lead Plaintiff's claims.

trend of increasing termite damage claims and in significant amounts coming from Alabama. Instead, for 2018 ServiceMaster reported that "there were no changes in the significant areas that require estimates" including termite damage claims, even though Defendants had known or should have known about the unfavorable trend of growing legal liabilities by that time. *Id.* ¶ 96. In other words, the Amended Complaint plausibly alleges that Defendants continued to caution investors about the possibility after they knew or should have known the potentiality for legal liabilities had ripened into an actuality. *Sec. and Exchange Comm'n. v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). The Court holds then that the Amended Complaint alleges enough factual matter with sufficient particularity to show that Terminix had more than potential legal exposure and still failed to disclose the information or modify its accruals.

To avoid this outcome, Defendants argue that accruals are accounting judgments tantamount to opinions. Even accepting the premise that an accrual reflects a professional (in this case a GAAP) judgment concerning the probability of a future liability, such an "opinion" may still qualify as a misrepresentation. The Supreme Court in *Omnicare* urged a more searching review of regulatory filings, particularly where an opinion in the statement "convey[s] facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188. In commenting on the reasonable investor standard, Omnicare explained

> Investors do not, and are right not to, expect opinions contained in those [SEC regulatory] statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life. At the same time, an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information. And the investor takes into account the customs and practices of the

relevant industry. So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame. The reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading.

*Id.* at 190–91.

The Supreme Court in *Omnicare* remanded the case to the lower courts to review the plaintiffs' pleadings "to determine whether it adequately alleged that Omnicare had omitted that (purported) fact, or any other like it, from the registration statement. And if so, the court must determine whether the omitted fact would have been material to a reasonable investor—*i.e.,* whether 'there is a substantial likelihood that a reasonable [investor] would consider it important.'" *Id.* at 196 (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "*Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 388 (2d Cir. 2021) (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020)).

In this case the Amended Complaint alleges that Defendants filed quarterly 10-Q's that included statements about ServiceMaster's accruals for termite damage claims but omitted other facts a reasonable investor would consider important, namely, the extent of the company's legal liability to customers experiencing Formosan termite infestation and particularly the litigation and arbitration proceedings already underway. These omitted facts would have been material to a reasonable investor reviewing the disclosures during the Class Period. Defendants' argument that the accounting judgments were merely inactionable opinions is not persuasive.

Defendants also object that the Amended Complaint leans too heavily on the reports of confidential witnesses whose testimony the Court should "steeply discount." It is true that Lead Plaintiff cites a number of corroborating statements given by confidential witnesses to buttress

some of the facts alleged in the Amended Complaint.  Few of those allegations, however, appear to originate only with confidential witness.  Even if they did, the use of a confidential witness is not fatal.  While it is the case that courts may discount information provided by anonymous sources, securities fraud plaintiffs may rely on confidential witnesses if the well-pleaded facts show that a person in the confidential witness's position would possess the information alleged.  *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037, n.2 (6th Cir. 2016).  By contrast, confidential witness cannot simply echo conclusory allegations with their own vague affirmations. *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539 at * 9 (S.D.N.Y. March 30, 2018). And even highly placed confidential witnesses may not suffice.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011). The proponent of confidential witness testimony must allege a high likelihood that the witness by virtue of his position or responsibilities was actually privy to the information. *Id.* at 590. In the alternative, the proponent's showing is not as high when other independent corroboration is alleged.

The Amended Complaint satisfies this standard.  Lead Plaintiff has adduced fact testimony from a number of confidential witnesses who were former Terminix employees.  Most of the facts alleged about the witnesses tend to show that each person was in a position to know about Terminix's handling for Formosan termite claims.  What is more, the Amended Complaint also cites additional facts from the Alabama Attorney General's report on Terminix's alleged violation of Alabama consumer protection law as well as factual findings from arbitrations between Terminix and its customers affected by Formosan termite infestations.  These pleadings suffice to accept the allegations of the confidential witness without discounting their reliability or veracity.

## C.    Defendants' SEC Disclosure Violations

The Amended Complaint finally alleges that Defendants failed to comply with their SEC disclosure requirements by failing to report Terminix's legal liabilities as part of their regulatory filings. According to the Amended Complaint, SEC disclosure rules require that every Form 10-K and Form 10-Q contain a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). Am. Compl. ¶ 107. Item 303 of Regulation S-K and subsequent SEC guidance set the framework for required MD&A disclosures. *Id*. For example, SEC Release No. 33-8350, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, states:

• The MD&A requirements are intended to satisfy three principal objectives:

• to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

• to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

• to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

*Id*. ¶ 107. Lead Plaintiff alleges that in accordance with the SEC's MD&A rules, Defendants were required to disclose: (a) the impact of the Formosan scheme, and the "mitigating" protocols Defendants implemented on ServiceMaster's reported revenues and EBITDA; (b) the material adverse trend in termite damage claims as Defendants' scheme unraveled; and (c) the negative impact of the Formosan scheme on ServiceMaster's future financial results. *Id.* ¶ 108. The Amended Complaint alleges that Defendants failed to make these required disclosures, rendering

ServiceMaster's Class Period financial statements materially misleading and in violation of SEC disclosure rules. *Id.* ¶¶ 108, 112.

Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.3, governs "[m]anagement's discussion and analysis of financial condition and results of operations" for full fiscal years. 17 C.F.R. § 229.3 For full fiscal year reports, the reporting company must discuss its "financial condition, changes in financial condition and results of operations." The report is required to

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

> (ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

> (iii) If the statement of comprehensive income presents material changes from period to period in net sales or revenue, if applicable, describe the extent to which such changes are attributable to changes in prices or to changes in the volume or amount of goods or services being sold or to the introduction of new products or services.

> (3) Critical accounting estimates. Critical accounting estimates are those estimates made in accordance with generally accepted accounting principles that involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on the financial condition or results of operations of the registrant. Provide qualitative and quantitative information necessary to understand the estimation uncertainty and the impact the critical accounting estimate has had or is reasonably likely to have on financial condition or results of operations to the extent the information is material and reasonably available. This information should include why each critical accounting estimate is subject to uncertainty and, to the extent the information is material and reasonably available, how much each estimate and/or assumption has changed over a relevant period, and the sensitivity of the reported amount to the methods, assumptions and estimates underlying its calculation.

17 C.F.R. § 229.303(b)(2) & (3); *see also J & R Marketing, SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390–91 (6th Cir. 2008).  "Disclosure is required where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir.  2017) (citation omitted).

Assuming that a private right of action exists for an Item 303 violation, the Court holds that the Amended Complaint plausibly alleges that Defendants omitted material information about termite damage claims from its SEC disclosures.  Lead Plaintiff alleges facts with particularity to show that Defendants knew or should have known about a trend of increasing claims, particularly from Alabama and then failed to disclose the likely impact of the trend to investors.  To some extent, Lead Plaintiffs' Item 303 disclosure claim overlaps with its claim regarding Defendants' failure to disclose the claims and adjust its accruals.  As the Court noted in its discussion of the accruals issue, the Amended Complaint alleges that senior executives, including Varty and DiLucente, were aware of Terminix's legal exposure to Formosan termite claims but did not make meaningful disclosures to reveal the extent of the exposure during the Class Period.  For largely the same reasons, the Court concludes that the Amended Complaint states a plausible claim for Defendants' failure to disclose the trend in its SEC filings.

Defendants argue that the Amended Complaint only alleges an increase in Formosan termite activity during the Class Period, not an increase in claims.  But the Amended Complaint belies this argument.  "As described in ¶¶116-118 and 121-124, Defendants later admitted the *material adverse trend in termite damage claims*. On October 22, 2019, Defendants revealed that the 'termite damage claims arising primarily from Formosan termite activity' 'concentrated in Mobile, Alabama,' had 'been increasing over the last few years,' unbeknownst to investors during

the Class Period." Am. Compl. ¶ 110 (emphasis added); *see also id.* ¶ 117.  Defendants parse the allegation to read "increasing over the last few years" as modifying or describing "Formosan termite activity."  Read in context, however, the Amended Complaint alleges that the claims "had been increasing over the last few years."  Defendants' close reading of the allegations is not convincing.

## III. Scienter

Having concluded that the Amended Complaint plausibly alleges, at least in part, material misrepresentations and misleading statements, the Court now considers whether the Amended Complaint has alleged Defendants' scienter with the particularity required by the PSLRA and Rule 9(b).  The PSLRA makes it a mandatory pleading requirement for a plaintiff "with respect to each act or omission alleged . . . [to] state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind" in violating the securities laws. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  This means "plaintiffs must plead facts showing that defendants had a mental state embracing intent to deceive, manipulate or defraud." *Omnicare III*, 769 F.3d at 472 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 (1976) (other citation omitted). "A strong inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Doshi*, 823 F.3d at 1039–40 (quoting *Tellabs*, 551 U.S. at 314). Under this heightened standard, courts must consider "plausible opposing inferences." *Id.* (citing *Tellabs*, 551 U.S. at 323). Courts "shall" dismiss pleadings that do not meet this standard. 15 U.S.C. § 78u-4(b)(3)(A).

In the context of securities fraud, scienter refers to a specific state of mind, "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness."  *Id*. (citing *Ley v. Visteon*

*Corp.*, 543 F.3d 801, 809 (6th Cir. 2008), *abrogated on other grounds by Matrixx Initiatives*, 563 U.S. at 48–50). "Recklessness is highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)) (internal punctuation omitted). Recklessness requires something more than negligence and is "akin to conscious disregard" and "typically require[s] multiple, obvious red flags," evidencing an "egregious refusal to see the obvious, or to investigate the doubtful." *Id.* (citations omitted).

"To decide if a plaintiff adequately pleaded a strong inference of scienter, we use a three-part test to determine the sufficiency of a plaintiff's scienter allegations." *Astec Indus.*, --- 4th ---, at *10 (citing *Dougherty*, 905 F.3d at 979). "First, we must accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. Next, the Court reviews the allegations holistically "to determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dougherty*, 905 F.3d at 979 (quoting *Tellabs*, 551 U.S. at 322–23). Finally, "we 'must take into account plausible opposing inferences' and decide whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323–24).

In assessing the pleadings for scienter, courts read the allegations in light of a non-exhaustive list of factors: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with

a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552; *see also Omnicare III*, 769 F.3d at 455, 473, 484 (applying the *Helwig* factors)).

Defendants argue that the Amended Complaint lacks allegations to create a strong inference of scienter.  As Defendants see it, Lead Plaintiff relies heavily on the reports of four confidential witnesses. Two of the witnesses, CW3 and CW4, were lower level employees who apparently had no direct contact with senior executives, and nothing in the Amended Complaint suggests that they passed on information to Varty or DiLucente.  As for the allegations about CW1 and CW2, the Amended Complaint alleges that both participated in meetings attended also by Varty where the Formosan termite issues coming out of Alabama were discussed.  However, there is nothing in the Amended Complaint to show what specifics were discussed as part of these meetings, what was said, or who said it.  Overall, the Amended Complaint alleges very few facts that would go to make out any of the *Helwig* factors.  Lead Plaintiff has not identified any document or meeting which would show Defendants had more knowledge of Terminix's increasing termite claims than their disclosures suggested.  The fact that some executives resigned has little or no probative value either.  Without more, the Amended Complaint has not alleged a strong inference of scienter.

The Court agrees. While the Amended Complaint alleges a plausible inference of scienter, the inference is not strong and is no more plausible than non-fraudulent explanations for the facts. Accepting, as the Court has, that some of Defendants' statements or omissions were misleading at the time they were made, the statements from ServiceMaster's SEC filings and the public comments made by Varty and DiLucente are not accompanied with strong evidence of scienter.

The Amended Complaint alleges that Defendants publicly announced a plan to "transform" the company's culture with a focus on delivering improved customer service as part of an effort to increase customer loyalty and account retention.  The company also acknowledged the existence of termite damage claims, though in a general way and without specific reference to any particular hot spot.  Even though the full extent of the termite damage claims did not come to light until October 2019, the disclosures made at earlier times during the Class Period acknowledged the existence of termite damage claims and the steps the company was taking through accruals to prepare for possible liabilities.

The Amended Complaint's strongest allegations concern what steps Defendants took to address the Formosan termite issues in and around Mobile, Alabama.  Privately, Defendants charted a course to take a harder position in Formosan hot spots like Mobile, by raising renewal rates, denying liability for termite damage, and forcing customers to resolve their disputes with the company in private arbitration proceedings.  The problems in Alabama were so serious that the Alabama Attorney General got involved and negotiated a settlement with the company over claims that ServiceMaster was in violation of Alabama consumer protection.  These allegations speak, though, only to one region or area of Terminix's termite business and largely give the Court the benefit of hindsight to appreciate the extent of the problems in Alabama.  Nothing in the Amended Complaint explains how much Terminix's problems in Alabama affected its overall position in the markets across all of the regions where Terminix operated.

What is more, nothing in the Amended Complaint gives any temporal context to the key developments identified in the pleadings.  The Court notes that most if not all of the allegations in the Amended Complaint lack allegations about the timing of (1) when Defendants identified the underlying issues at work in hot spots like Mobile, (2) when Defendants adopted certain responses

to address the issues in the hot spots, (3) when the specific arbitration awards described in the pleadings became final, (4) when the Alabama Attorney General opened his investigation into Terminix's practices and when Defendants learned about it, and (5) the temporal scope of the investigation. Without an actual timeline of these critical developments, the Amended Complaint does not create a strong inference of scienter.

In sum, the allegations can be read to plausibly suggest that Defendants knew they had a problem in Alabama and then misled investors about the extent of the problem, touting their plans for a transformation of the Terminix business as a shield to hide the Formosan termite issues. But the allegations can also be read to suggest that Defendants' plans for a transformation of the Terminix business were announced to correct systemic issues at Terminix that caused the problems in Alabama in the first place. The Court holds that the allegations in the Amended Complaint are just as "consistent with the more plausible, non-culpable inference" that Defendants had developed what they thought was a solution to larger problems at Terminix, problems that manifested themselves in the Formosan termite claims in Alabama, and that Defendants disclosed the existence of the problem once it was confronted with significant arbitration awards with reasonable promptness. *In re Gen. Elec.*, 844 F. App'x at 388–89. The inference argued by Lead Plaintiff that Defendants acted with the intent to deceive investors is merely plausible but not the only explanation from the facts alleged. This is not enough to plead a "strong inference" of scienter.

An individualized analysis of each Defendant's own scienter only reinforces the conclusion. The only plausible allegations of Varty making misleading statements concerned information contained in the SEC filings made on behalf of ServiceMaster during the Class Period. There is no strong inference that, "in signing the reports, [Varty] acted with a 'knowing and deliberate intent to manipulate, deceive, or defraud,' or that his signature amounts to 'highly

unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *Astec Indus.*, --- 4th ---, at *15 (citing *Doshi*, 823 F.3d at 1039). "Although he likely could have done more to verify the reports, that failure indicates negligence at most, which cannot support a securities-fraud claim." *Id.*  The same reasoning applies to DiLucente and the statements he affirmed in ServiceMaster's SEC filings. Furthermore, DiLucente's misleading comments explaining Terminix's improved market-based pricing from May 2019 lack any additional context to allege what other facts were then known to him and which would support a strong inference of scienter.  Without that context, it is just as plausible that his statement about market-based forces represented his own opinion about which factor (improving market-based forces generally or raising renewal rates on customers in Alabama specifically) best explained the price increases Terminix was able to charge that quarter.  It bears repeating nothing in the Amended Complaint alleges when the company embarked on the drastic rate increases or shows that the policy in Alabama was actually the reason Terminix enjoyed better pricing across all of the markets where it operated in early 2019.

This just leaves the scienter allegations concerning ServiceMaster itself.  Because "the § 10(b) claims against the company rise and fall with the claims against the individual defendants," the Court cannot say that the Amended Complaint creates a strong inference of scienter as to the corporation. *Astec Indus.*, --- 4th ---, at *15. Where "[a]ny high managerial agent or member of the board of directors acts with the necessary scienter, their state of mind can be imputed to the corporation." *Id.* (citing *Omnicare III*, 769 F.3d at 476).  In the absence of a strong allegation of scienter against Varty or DiLucente, the Court holds that the Amended Complaint has not created a strong inference of scienter as to ServiceMaster.

In its response on the scienter question, Lead Plaintiff argues that the Amended Complaint alleges enough facts under the *Helwig* factors to carry Lead Plaintiff's burden to plead scienter with specificity.   The Court does not find Lead Plaintiff's arguments persuasive.   First, the closeness in time between a fraudulent disclosure and the later disclosure of inconsistent information is not strong in this case.   The Sixth Circuit treats this *Helwig* factor "as potentially probative of scienter because a short turnaround makes it less likely that the corporation did not know that its statement was misleading." *Dougherty*, 905 F.3d at 981 (citing *Omnicare III*, 769 F.3d at 484).  But the factor becomes less significant as time passes, so "a one-week span between an allegedly fraudulent statement and a subsequent inconsistent disclosure" may have strong probative value, a four-month gap not so much. *Bridgestone*, 399 F.3d at 684, 687–88. Here the gap between the last allegedly incomplete disclosure (August 2019) and the release of corrective information (October 2019) was more than two months.  The Amended Complaint fails to allege any facts to show when the extent and amount of the arbitration awards first became known to Defendants.  Without that material information, this factor does not carry as much weight here.

Lead Plaintiff also cites a divergence between internal reports, specifically internal meetings where the Formosan termite issues were discussed, and public statements.  The Amended Complaint develops these allegations through reports from confidential witnesses who were former Terminix employees with knowledge of the Alabama problems.  While it is true that courts treat "the contents of meetings at which senior corporate officers were present as 'internal reports,'" *Dougherty*, 905 F.3d at 981, the Amended Complaint alleges no facts to show what the substance of the meetings covered, only that the Formosan claims came up. The Amended Complaint never actually alleges which meetings Varty or DiLucente attended where the Formosan termite claims in Alabama were discussed, only that other executives who reported to

Varty may have attended the meetings. And as the Court has already explained, the allegations in this case are just as consistent with a view that Defendants launched the transformation of the company to address the longer-running problems that resulted in the Formosan termite claims. The Court holds that these allegations do not create a strong inference of scienter.

Lead Plaintiff is left to rely then on the core operations doctrine and the fact that Varty and other executives left the company shortly after the extent of the Formosan termite claims were revealed. Lead Plaintiff argues that under the core operations doctrine, the Court can merely assume Defendants had knowledge of the Formosan termite issues Terminix was facing in Alabama. As Defendants correctly note, there is some question over whether the doctrine is still viable. *E.g. Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("[W] e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter."). Other courts treat the doctrine as a secondary consideration in analyzing scienter. *Stein v. U.S. Xpress Enters., Inc.*, No. 1:19-cv-98, 2020 WL 3584800, at *39 (E.D. Tenn. June 30, 2020) ("A majority of district courts appear to have concluded that the doctrine survived, albeit only as a supplementary consideration that may bolster other well-pleaded facts." (collecting cases). The Court tends to agree that the core operations doctrine could provide some probative support for a finding of scienter, depending on the facts of a given case. In any event, the fact that Terminix was faced with significant legal claims related to its core business in one market in which the company operated would presumably be known to senior executives at the company. The inference, however, is just one factual premise and does not, standing alone, give rise to a strong inference of scienter. The Amended Complaint fails to allege with specificity when Defendants first learned of the adverse arbitration awards. And the timing of Varty's resignation and the departures of other senior executives does not clearly show scienter. The Amended Complaint

just implies that the timing was not "good optics" for ServiceMaster and Varty but alleges no other facts to explain the circumstances of Varty's resignation.

Having concluded that the Amended Complaint plausibly alleges how some of Defendants' statements were misleading but that the Amended Complaint does not allege a strong inference of scienter, Defendants' Motion to Dismiss must be **GRANTED**.

## IV. Control Person Claims

The Amended Complaint alleges claims against Varty and DiLucente as "control persons" ServiceMaster, meaning that each was in a position to control the company's disclosures and failed to prevent the disclosure of misleading information. Section 20 of the Exchange Act provides that "[e]very person who ... controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). The parties agree that Lead Plaintiff's "control person" cause of action derives from the corresponding disclosure claims and therefore rises and falls with those predicate claims. Because the Court is granting Defendants' Joint Motion to Dismiss the Rule 10b-5(b) disclosure claims, the control person claims based on the disclosures are dismissed as well.

## <u>CONCLUSION</u>

The Court holds that the Amended Complaint fails to meet the heightened pleadings standard by alleging all of the elements of a Rule10b-5(b) misrepresentations claim for securities fraud.  The Court takes no position on the merits of the Amended Complaint's allegations of scheme liability under Rule 10b-5(a) or (c).  Defendants' Joint Motion to Dismiss the Rule 10b-5(b) misrepresentations claim is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date:  March 31, 2022.